# Exhibit A

## MEZZANINE LOAN AGREEMENT

Dated as of August 29, 2008

Between

## MADISON HOTEL OWNERS LLC,
as Borrower

and

## ESTATE OF LAWRENCE MEINWALD,
as Lender

## FIXED RATE MEZZANINE LOAN

62 Madison Avenue, New York, New York
Loan Amount:  $5,000,000.00

## TABLE OF CONTENTS

I.      DEFINITIONS; PRINCIPLES OF CONSTRUCTION ..................................................2

**Section 1.1**    Definitions ..........................................................................................................2

**Section 1.2**    Principles of Construction ................................................................................15

II.     GENERAL TERMS ...............................................................................................16

**Section 2.1**    Loan Commitment; Disbursement to Borrower ..................................................16

**Section 2.2**    Interest Rate ......................................................................................................16

**Section 2.3**    Loan Payment ...................................................................................................17

**Section 2.4**    Prepayments......................................................................................................18

**Section 2.5**    Intentionally Omitted .......................................................................................19

**Section 2.6**    Release of Collateral ........................................................................................19

**Section 2.7**    Release on Payment in Full ..............................................................................19

**Section 2.8**    Cash Management .............................................................................................20

III.    CONDITIONS PRECEDENT...............................................................................20

**Section 3.1**    Conditions Precedent to Closing ......................................................................20

IV.     REPRESENTATIONS AND WARRANTIES ....................................................23

**Section 4.1**    Borrower Representations .................................................................................23

**Section 4.2**    Survival of Representations ..............................................................................30

V.      BORROWER COVENANTS ................................................................................30

**Section 5.1**    Affirmative Covenants......................................................................................30

**Section 5.2**    Negative Covenants ..........................................................................................38

VI.     INSURANCE; CASUALTY; CONDEMNATION .............................................44

**Section 6.1**    Insurance............................................................................................................44

**Section 6.2**    Casualty ............................................................................................................45

**Section 6.3**    Condemnation....................................................................................................45

**Section 6.4**    Restoration ................................................................................46

**Section 6.5**    Casualty and Condemnation Proceeds.................................46

VII.    RESERVE FUNDS ..............................................................................46

**Section 7.1**    Interest Reserve ..........................................................................46

**Section 7.2**    Tax and Insurance Escrow Fund...............................................47

**Section 7.3**    Intentionally Omitted...................................................................47

**Section 7.4**    Reserve Funds Generally ............................................................48

VIII.    DEFAULTS .........................................................................................49

**Section 8.1**    Event of Default...........................................................................49

**Section 8.2**    Remedies.......................................................................................51

IX.    SPECIAL PROVISIONS.......................................................................53

**Section 9.1**    Sale of Note .................................................................................53

**Section 9.2**    Intentionally Omitted...................................................................53

**Section 9.3**    Intentionally Omitted...................................................................53

**Section 9.4**    Intentionally Omitted...................................................................53

**Section 9.5**    Matters Concerning Manager ....................................................54

**Section 9.6**    Servicer .........................................................................................54

X.    MISCELLANEOUS ...............................................................................54

**Section 10.1**    Survival ......................................................................................54

**Section 10.2**    Lender's Discretion ...................................................................54

**Section 10.3**    Governing Law ..........................................................................54

**Section 10.4**    Modification, Waiver in Writing ..............................................56

**Section 10.5**    Delay Not a Waiver ...................................................................56

**Section 10.6**    Notices .......................................................................................56

**Section 10.7**    Trial by Jury...............................................................................57

**Section 10.8**   Headings ..................................................................................................58

**Section 10.9**   Severability ............................................................................................58

**Section 10.10**  Preferences ............................................................................................58

**Section 10.11**  Waiver of Notice ....................................................................................58

**Section 10.12**  Remedies of Borrower ............................................................................58

**Section 10.13**  Expenses; Indemnity ..............................................................................59

**Section 10.14**  Schedules Incorporated ..........................................................................59

**Section 10.15**  Offsets, Counterclaims and Defenses ....................................................60

**Section 10.16**  No Joint Venture or Partnership; No Third Party Beneficiaries............60

**Section 10.17**  Subordinate Nature of Agreement ..........................................................60

**Section 10.18**  Waiver of Marshalling of Assets ............................................................60

**Section 10.19**  Waiver of Counterclaim .........................................................................61

**Section 10.20**  Conflict; Construction of Documents; Reliance......................................61

**Section 10.21**  Brokers and Financial Advisors ..............................................................61

**Section 10.22**  Prior Agreements ...................................................................................61

## SCHEDULES

Schedule I       -        Organizational Structure

## MEZZANINE LOAN AGREEMENT

THIS MEZZANINE LOAN AGREEMENT, dated as of August 29, 2008 (as amended, restated, replaced, supplemented or otherwise modified from time to time, this "Agreement"), between ESTATE OF LAWRENCE MEINWALD, having an address at c/o Gerald B. Gasman, P.C., 10 Park Avenue, Suite 2A, New York, New York 10016 (together with its successors and/or assigns "Lender"), and MADISON HOTEL OWNERS LLC, a New York limited liability company, having its principal place of business at c/o Livorno Properties LLC, 150 East 52nd Street, 10th Floor, New York, New York 10022 ("Borrower").

## W I T N E S S E T H:

WHEREAS, TEXTRON FINANCIAL CORPORATION, a Delaware corporation, as mortgage lender ("Mortgage Lender"), is making a loan in the principal amount of up to THIRTY MILLION and 00/100 Dollars ($30,000,000.00) (the "Mortgage Loan") to MADISON HOTEL LLC, a New York limited liability company ("Mortgage Borrower") pursuant to that certain Building Loan Agreement and that certain Project Loan Agreement, each dated as of the date hereof (as the same may be amended, supplemented, replaced or otherwise modified from time to time, collectively, the "Mortgage Loan Agreement"), which Mortgage Loan is evidenced by that certain Building Loan Note and that certain Project Loan Note, each dated as of the date hereof (as the same may be amended, supplemented, replaced or otherwise modified from time to time, collectively, the "Mortgage Note"), made by Mortgage Borrower to Mortgage Lender and secured by, among other things, that certain Building Loan Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing, and that certain Project Loan Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing, each dated as of the date hereof (as the same may be amended, supplemented, replaced or otherwise modified from time to time, collectively, the "Mortgage") given by Mortgage Borrower in favor of Mortgage Lender, pursuant to which Mortgage Borrower has granted Mortgage Lender a first priority mortgage lien on, among other things, the Property and other collateral as more fully described in the Mortgage;

WHEREAS, Borrower is the legal and beneficial owner of 100% of the issued and outstanding limited liability company interests in Mortgage Borrower;

WHEREAS, Borrower desires to obtain the Loan (as hereinafter defined) from Lender;

WHEREAS, as a condition precedent to the obligation of Lender to make the Loan to Borrower, Borrower has entered into that certain Pledge and Security Agreement, dated as of the date hereof, in favor of Lender (as amended, supplemented or otherwise modified from time to time, the "Pledge Agreement"), pursuant to which Borrower has granted to Lender a first priority security interest in the Collateral (as defined in the Pledge Agreement, and together with all other security for the Loan under the Loan Documents, the "Collateral") as collateral security for the Debt (as hereinafter defined); and

10728081.5

**WHEREAS**, Lender is willing to make the Loan to Borrower, subject to and in accordance with the terms and conditions of this Agreement and the other Loan Documents (as hereinafter defined).

**NOW THEREFORE**, in consideration of the making of the Loan by Lender and the covenants, agreements, representations and warranties set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby covenant, agree, represent and warrant as follows:

## I.    DEFINITIONS; PRINCIPLES OF CONSTRUCTION

**Section 1.1    Definitions.**    For all purposes of this Agreement, except as otherwise expressly required or unless the context clearly indicates a contrary intent:

"**Affiliate**" shall mean, as to any Person, any other Person (A) directly or indirectly Controlling, Controlled by, or under common Control with, such Person, (B) directly or indirectly owning or holding ten percent (10%) or more of any equity interest in such Person, and/or (C) ten percent (10%) or more of whose voting stock or other equity interest is directly or indirectly owned or held by such Person.  When used with respect to Borrower, the term "**Affiliate**" shall also include the spouse, ancestors, descendents and siblings of an Affiliate of Borrower (such Persons being sometimes referred to as "**Family Members**"), Affiliates of such Family Members and trusts for the benefit of another Affiliate of Borrower.

"**Affiliated Manager**" shall mean any managing agent in which Borrower, Mortgage Borrower, Principal, or any Guarantor has, directly or indirectly, a legal, beneficial or economic interest in excess of 10%.

"**Agreement**" shall have the meaning set forth in the preamble.

"**ALTA**" shall mean American Land Title Association, or any successor thereto.

"**Approved Budget**" shall have the meaning set forth in Section 5.1.11(f).

"**Award**" shall mean any compensation paid by any Governmental Authority in connection with a Condemnation.

"**Bankruptcy Action**" shall mean with respect to any Person (a) such Person filing a voluntary petition under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law; (b) the filing of an involuntary petition against such Person under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law in which such Person colludes with, or otherwise assists such Person, or soliciting or causing to be solicited petitioning creditors for any involuntary petition against such Person; (c) such Person filing an answer consenting to or otherwise acquiescing in or joining in any involuntary petition filed against it, by any other Person under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law; (d) such Person consenting to or acquiescing in or joining in an application for the appointment of a custodian, receiver, trustee, or examiner for such Person or any portion of the Property; or (e) such Person making an assignment for the benefit of creditors,

or admitting, in writing or in any legal proceeding, its insolvency or inability to pay its debts as they become due.

"**Basic Carrying Costs**" shall mean, for any period, the sum of the following costs: (a) Taxes, (b) Other Charges and (c) Insurance Premiums.

"**Bookings**" shall mean all commitments, and agreements regarding future use of guest rooms, banquet rooms, conference rooms and other facilities constituting part of the Land and Improvements.

"**Booking Deposits**" shall mean all deposits, advance payments and similar items for Bookings.

"**Borrower**" shall have the meaning set forth in the introductory paragraph hereto, together with its successors and permitted assigns.

"**Business Day**" shall mean any day other than a Saturday, Sunday or any other day on which national banks in New York, New York are not open for business.

"**Capital Expenditures**" shall mean, for any period, the amount expended for items capitalized under GAAP (including expenditures for building improvements or major repairs, leasing commissions and tenant improvements).

"**Capital Lease**" shall mean any lease of any property (whether real, personal or mixed) that, in conformity with GAAP, should be accounted for as a capital lease.

"**Casualty**" shall have the meaning specified in Section 6.2 hereof.

"**Change in Control**" shall mean the occurrence of any one or more of the following: (i) a Person (other than Borrower, 62 Madison Partners LLC or Guarantors) shall have acquired, in one or more transactions, ownership or control of more than 50% of the voting Securities of Borrower, (ii) the Guarantors shall collectively cease to directly or indirectly Control the business and affairs of Borrower or Mortgage Borrower, or (iii) the Guarantors shall cease to directly or indirectly own thirty percent (30%) or more of the Securities of Borrower.

"**Closing Date**" shall mean the date of the funding of the Loan.

"**Code**" shall mean the Internal Revenue Code of 1986, as heretofore amended and as it may be further amended from time to time, and any successor statutes thereto, and applicable U.S. Department of Treasury regulations issued pursuant thereto in temporary or final form.

"**Collateral**" shall have the meaning set forth in the Recitals to this Agreement.

"**Completion of Construction**" shall mean the date when Lender determines that Construction has been completed in accordance with the Plans and Specifications, and when all of the conditions of Section 3.3 of the Mortgage Loan Agreement have been satisfied to Lender's

satisfaction (which shall include the delivery to Lender of all the items required to be delivered to Mortgage Lender thereunder).

"**Condemnation**" shall mean a temporary or permanent taking by any Governmental Authority as the result or in lieu or in anticipation of the exercise of the right of condemnation or eminent domain, of all or any part of the Property, or any interest therein or right accruing thereto, including any right of access thereto or any change of grade affecting the Property or any part thereof.

"**Construction**" shall have the meaning ascribed to such term in the Mortgage Loan Agreement.

"**Contingent Obligation**" shall mean any agreement, undertaking or arrangement by which a Person assumes, guarantees, endorses, contingently agrees to purchase or provide funds for the payment of, or otherwise becomes or is contingently liable upon, the obligation or liability of any other Person, or agrees to maintain the net worth or working capital or other financial condition of any other Person, or otherwise assures any creditor of such other Person against loss, including, without limitation, any comfort letter, operating agreement, take-or-pay contract or the obligations of any such Person as general partner of a partnership with respect to the liabilities of the partnership.

"**Contractual Obligation**" shall mean as to any Person, any provision of (a) any security issued by such Person; (b) any agreement, instrument or undertaking to which such Person is a party or by which it or any of its property is bound; or (c) any of the foregoing.

"**Control**" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of management, policies or activities of a Person, whether through ownership of voting securities, by contract or otherwise. "**Controlled**" and "**Controlling**" shall have correlative meanings.

"**Debt**" shall mean the outstanding principal amount set forth in, and evidenced by, this Agreement and the Note, together with all interest accrued and unpaid thereon and all other sums due to Lender in respect of the Loan under the Note, this Agreement, the Pledge Agreement or any other Loan Document.

"**Debt Service**" shall mean, with respect to any particular period of time, scheduled principal and interest payments due under this Agreement and the Note.

"**Default**" shall mean the occurrence of any event hereunder or under any other Loan Document which, but for the giving of notice or passage of time, or both, would be an Event of Default.

"**Default Rate**" shall mean, with respect to the Loan, a rate per annum equal to the lesser of (a) the Maximum Legal Rate and (b) five percent (5%) above the Interest Rate.

"**Draw Period**" shall mean the lesser of: (i) the first eighteen (18) months after the Closing Date; and (ii) the period between the Closing Date and Completion of Construction.

10728081.5                          - 4 -

"**Eligible Account**" shall mean a separate and identifiable account from all other funds held by the holding institution that is either (a) an account or accounts maintained with a federal or state-chartered depository institution or trust company which complies with the definition of Eligible Institution or (b) a segregated trust account or accounts maintained with a federal or state chartered depository institution or trust company acting in its fiduciary capacity which, in the case of a state chartered depository institution or trust company, is subject to regulations substantially similar to 12 C.F.R. §9.10(b), having in either case a combined capital and surplus of at least $50,000,000 and subject to supervision or examination by federal and state authority. An Eligible Account will not be evidenced by a certificate of deposit, passbook or other instrument.

"**Eligible Institution**" shall mean a depository institution or trust company subject to supervision and examination by federal or state banking authorities approved by Mortgage Lender.

"**Embargoed Person**" shall have the meaning set forth in Section 4.1.35 hereof.

"**Environmental Indemnity**" shall mean that certain Environmental Indemnity Agreement dated as of the date hereof, executed by Borrower and Guarantor in connection with the Loan for the benefit of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Environmental Report**" shall mean the report dated June 6, 2008 prepared by LandAmerica Commercial Services regarding the environmental condition of the Property.

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as amended.

"**Event of Default**" shall have the meaning set forth in Section 8.1(a) hereof.

"**Extraordinary Expense**" shall have the meaning set forth in Section 5.1.11(g) hereof.

"**Fiscal Year**" shall mean each twelve (12) month period commencing on January 1 and ending on December 31 during each year of the term of the Loan.

"**GAAP**" shall mean generally accepted accounting principles in the United States of America as of the date of the applicable financial report.

"**Governmental Authority**" shall mean any court, board, agency, commission, office or other authority of any nature whatsoever for any governmental unit (federal, state, county, district, municipal, city or otherwise) whether now or hereafter in existence.

"**Gross Income from Operations**" shall mean, for any period, all sustainable income, computed in accordance with GAAP, derived from the ownership and operation of the Property from whatever source during such period, including, but not limited to, Rents from tenants in occupancy and paying full contractual rent without right of offset or credit, utility charges, escalations, forfeited security deposits, interest on credit accounts, service fees or

charges, license fees, parking fees, rent concessions or credits, business interruption or other loss of income or rental insurance proceeds or other required pass-throughs reimbursements paid by tenants under the Leases of any nature and interest on Reserve Funds, if any, but excluding Rents from month to month tenants or tenants that are included in any Bankruptcy Action, sales, use and occupancy or other taxes on receipts required to be accounted for by Borrower to any Governmental Authority, refunds and uncollectible accounts, sales of furniture, fixtures and equipment, proceeds of casualty insurance and condemnation awards (other than business interruption or other loss of income or rental insurance), and any disbursements to Borrower from the Reserve Funds, if any.

"**Guarantor**" shall mean, collectively, jointly and severally, Joseph Ben Moha and Benzion Suky, each of whom are natural persons.

"**Guaranty**" shall mean that certain Guaranty of Payment Agreement dated as of the date hereof, jointly and severally, from Guarantor to and for the benefit of Lender as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Improvements**" shall have the meaning set forth in the granting clause of the Mortgage.

"**Indebtedness**" of a Person, at a particular date, shall mean the sum (without duplication) at such date of (a) all indebtedness or liability of such Person (including, without limitation, amounts for borrowed money and indebtedness in the form of mezzanine debt and preferred equity); (b) obligations evidenced by bonds, debentures, notes, or other similar instruments; (c) obligations for the deferred purchase price of property or services (including trade obligations); (d) obligations under letters of credit; (e) obligations under acceptance facilities; (f) all guaranties, endorsements (other than for collection or deposit in the ordinary course of business) and other contingent obligations to purchase, to provide funds for payment, to supply funds, to invest in any Person or entity, or otherwise to assure a creditor against loss; and (g) obligations secured by any Liens, whether or not the obligations have been assumed.

"**Indemnifying Person**" shall mean each of Borrower, Principal and Guarantor.

"**Insurance Premiums**" shall have the meaning set forth in Section 6.1(b) hereof.

"**Insurance Proceeds**" shall have the meaning ascribed to such term in the Mortgage Loan Agreement.

"**Insurance Reserve Fund**" shall have the meaning set forth in Section 7.2.1 hereof.

"**Intercreditor Agreement**" shall mean that certain Intercreditor Agreement dated as of the date hereof, by and between Lender and Mortgage Lender (as the same may be amended, modified, extended and/or replaced from time to time).

"**Interest Period**" shall mean, (i) with respect to any Payment Date during the Draw Period, the period commencing on the tenth (10th) day of the preceding calendar month to

and including the ninth (9th) day of the month in which such Payment Date occurs, and (ii) with respect to any payment date after the Draw Period, the period of days from the first (1st) day of preceding calendar month to the last day of such month; provided, however, that no Interest Period shall end later than the Maturity Date (other than for purposes of calculating interest at the Default Rate), and the initial Interest Period shall commence on and include the date hereof and end on and include the following ninth (9th) day of the calendar month.

"**Interest Rate**" shall mean a rate of Twelve Percent (12%) per annum.

"**Interest Reserve Fund**" shall have the meaning ascribed to such term in the Mortgage Loan Agreement.

"**Lease**" shall mean any lease, sublease or sub-sublease, letting, license, concession or other agreement (whether written or oral and whether now or hereafter in effect) pursuant to which any Person is granted a possessory interest in, or right to use or occupy all or any portion of any space in the Property, and every modification, amendment or other agreement relating to such lease, sublease, sub-sublease, or other agreement entered into in connection with such lease, sublease, sub-sublease, or other agreement and every guarantee of the performance and observance of the covenants, conditions and agreements to be performed and observed by the other party thereto.

"**Legal Requirements**" shall mean all federal, state, county, municipal and other governmental statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions of Governmental Authorities affecting the Property or any part thereof, or the construction, use, alteration or operation thereof, or any part thereof, whether now or hereafter enacted and in force, and all permits, licenses and authorizations and regulations relating thereto, and all covenants, agreements, restrictions and encumbrances contained in any instruments, either of record or known to Borrower or Mortgage Borrower, at any time in force affecting Borrower, Mortgage Borrower, the Property or any part thereof, including, without limitation, any which may (a) require repairs, modifications or alterations in or to the Property or any part thereof, or (b) in any way limit the use and enjoyment thereof.

"**Lender**" shall have the meaning set forth in the introductory paragraph hereto, together with its successors and assigns.

"**Lien**" shall mean any mortgage, deed of trust, lien, pledge, hypothecation, easement, restrictive covenant, preference, assignment, security interest, or any other encumbrance, charge or transfer of, or any agreement to enter into or create, any of the foregoing, on or affecting Borrower, Mortgage Borrower, the Property, the Collateral, or any portion thereof or any interest therein, or any direct or indirect interest in Borrower, Mortgage Borrower or Principal, including, without limitation, any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanic's, materialmen's and other similar liens and encumbrances.

"**Liquidation Event**" shall have the meaning set forth in Section 2.4.4(a) hereof.

"**Loan**" shall mean the loan made by Lender to Borrower pursuant to this Agreement.

"**Loan Documents**" shall mean, collectively, this Agreement, the Note, the Pledge Agreement, the Environmental Indemnity, the Guaranty and all other documents now or hereafter executed and/or delivered in connection with the Loan (as each may be amended, modified, extended, consolidated or supplemented from time to time).

"**Management Agreement**" shall mean the Hotel Consulting and Management Agreement for the Property between Mortgage Borrower and Manager dated July 9, 2008, as may be amended from time to time with the prior written consent of Lender or, if the context requires, the Replacement Management Agreement executed in accordance with the terms and provisions of this Agreement.

"**Management Fee Cap**" shall mean four percent (4%) of Gross Income from Operations.

"**Manager**" shall mean Tecton Madison 28 Management Services, LLC, a Florida limited liability company, or, if the context requires, a Qualified Manager who is managing the Property in accordance with the terms and provisions of this Agreement.

"**Maturity Date**" shall mean the earlier to occur of (i) the refinancing of the Mortgage Loan and (ii) the Payment Date occurring in August 2011, or such other date on which the final payment of principal of the Note becomes due and payable as therein or herein provided, whether at such stated maturity date, by declaration of acceleration, or otherwise.

"**Maximum Legal Rate**" shall mean the maximum non-usurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the indebtedness evidenced by the Note and as provided for herein or the other Loan Documents, under the laws of such state or states whose laws are held by any court of competent jurisdiction to govern the interest rate provisions of the Loan.

"**Mezzanine Debt Service Advances**" shall have the meaning ascribed to such term in Section 2.3.1.

"**Monthly Payment**" shall have the meaning ascribed to such term in Section 2.3.1.

"**Mortgage**" shall have the meaning set forth in the Recitals to this Agreement.

"**Mortgage Borrower**" shall have the meaning set forth in the Recitals to this Agreement.

"**Mortgage Lender**" shall have the meaning set forth in the Recitals to this Agreement.

"**Mortgage Loan**" shall have the meaning set forth in the Recitals to this Agreement.

"**Mortgage Loan Agreement**" shall have the meaning set forth in the Recitals to this Agreement.

"**Mortgage Loan Default**" shall mean a "Default" under and as defined in the Mortgage Loan Agreement.

"**Mortgage Loan Event of Default**" shall mean an "Event of Default" under and as defined in the Mortgage Loan Agreement.

"**Mortgage Loan Documents**" shall mean, collectively, the Mortgage Note, the Mortgage Loan Agreement, the Mortgage and any and all other documents defined as "Loan Documents" in the Mortgage Loan Agreement, as amended, restated, replaced, extended, renewed, severed, split, supplemented or otherwise modified from time to time.

"**Net Cash Flow**" for any period shall mean the amount obtained by subtracting Operating Expenses and Capital Expenditures for such period from Gross Income from Operations for such period.

"**Net Liquidation Proceeds After Debt Service**" shall mean, with respect to any Liquidation Event, all amounts paid to or received by or on behalf of Mortgage Borrower in connection with such Liquidation Event, including, without limitation, proceeds of any sale, refinancing or other disposition or liquidation, less (a) Lender's and/or Mortgage Lender's reasonable costs incurred in connection with the recovery thereof, (b) the costs incurred by Mortgage Borrower in connection with a Restoration of all or any portion of the Property made in accordance with the Mortgage Loan Documents, (c) amounts required or permitted to be deducted therefrom and amounts paid pursuant to the Mortgage Loan Documents to Mortgage Lender, (d) in the case of a foreclosure sale, disposition or Transfer of the Property in connection with realization thereon following an Event of Default under the Mortgage Loan, such reasonable and customary costs and expenses of sale or other disposition (including attorneys' fees and brokerage commissions), (e) in the case of a foreclosure sale, such costs and expenses incurred by Mortgage Lender under the Mortgage Loan Documents as Mortgage Lender shall be entitled to receive reimbursement for under the terms of the Mortgage Loan Documents, (f) in the case of a refinancing of the Mortgage Loan, such costs and expenses (including attorneys' fees) of such refinancing as shall be reasonably approved by Mortgage Lender and Lender, and (g) the amount of any prepayments required pursuant to the Mortgage Loan Documents and/or the Loan Documents, in connection with any such Liquidation Event.

"**Note**" shall mean that certain Promissory Note dated of even date herewith in the principal amount of Five Million and 00/100 Dollars ($5,000,000.00), made by Borrower in favor of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Operating Account**" shall mean an Account which is an insured demand deposit account or securities account, which account shall be held at an Eligible Institution and shall be in the name of Mortgage Borrower, established in accordance with the terms of the Mortgage Loan Agreement.

"**Operating Budget**" shall have the meaning set forth in Section 5.1.11(f).

"**Operating Expenses**" shall mean, for any period, the total of all expenditures computed in accordance with GAAP, of whatever kind during such period relating to the operation, maintenance and management of the Property that are actually incurred on a regular monthly or other periodic basis, including, without limitation, utilities, ordinary repairs and maintenance, insurance, license fees, property taxes and assessments, advertising expenses, management fees, payroll and related taxes, computer processing charges, tenant improvements and leasing commissions, operational equipment or other lease payments as approved by Lender, and other similar costs (including hourly employees for contracted services), equipment lease payments and management fees payable under the Management Agreement, but excluding depreciation, Debt Service, debt service under the Mortgage Loan, Capital Expenditures, and contributions to the Tax and Insurance Reserve Fund, the Interest Reserve Fund and any other reserves required under the Loan Documents or the Mortgage Loan Documents.

"**Other Charges**" shall mean all ground rents, maintenance charges, impositions other than Taxes, and any other charges, including, without limitation, vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Property, now or hereafter levied or assessed or imposed against the Property or any part thereof.

"**Outstanding Principal Balance**" shall mean, as of such date, the outstanding principal balance of the Loan.

"**Payment Date**" shall mean the tenth (10th) day of each calendar month during the Draw Period, and the first (1st) day of each calendar month thereafter or, if such day is not a Business Day, the immediately preceding Business Day.

"**Permitted Encumbrances**" shall mean, collectively, (a) the Liens and security interests created by the Loan Documents and the Mortgage Loan Documents, (b) all Liens, encumbrances and other matters disclosed in the Title Insurance Policy relating to the Property or any part thereof, (c) Liens, if any, for Taxes imposed by any Governmental Authority not yet due or delinquent, and (d) such other title and survey exceptions as Lender has approved or may approve in writing in Lender's sole discretion.

"**Person**" shall mean any individual, corporation, partnership, joint venture, limited liability company, estate, trust, unincorporated association, any federal, state, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

"**Personal Property**" shall have the meaning set forth in the granting clause of the Mortgage.

"**Pledge Agreement**" shall have the meaning set forth in the Recitals to this Agreement.

"**Policies**" shall have the meaning specified in <u>Section 6.1(b)</u> hereof.

"**Prescribed Laws**" shall mean, collectively, (a) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56) (The USA PATRIOT Act), (b) Executive Order No. 13224 on

Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism, (c) the International Emergency Economic Power Act, 50 U.S.C. §1701 et. seq. and (d) all other Legal Requirements relating to money laundering or terrorism.

"**Principal**" shall mean: (i) if Borrower is a limited partnership, the Special Purpose Entity that is the general partner of Borrower; (ii) if Borrower is a limited liability company meeting all of the requirements applicable to a single-member limited liability company set forth in the definition of "Special Purpose Entity," the member of Borrower; or (iii) if Borrower is a limited liability company other than one described in the preceding item, the Special Purpose Entity that is the managing member of Borrower.

"**Property**" shall mean each parcel of real property, the Improvements thereon and all Personal Property owned by Mortgage Borrower and encumbered by the Mortgage, together with all rights pertaining to such property and Improvements, as more particularly described in the granting clause of the Mortgage and referred to therein as the "Property".

"**Provided Information**" shall mean any and all financial and other information provided at any time by, or on behalf of, any Indemnifying Person with respect to the Property, the Collateral, Borrower, Mortgage Borrower, Guarantor and/or Manager.

"**Qualified Manager**" shall mean either (a) the Manager or (b) in the reasonable judgment of Lender, a reputable and experienced management organization (which may be an Affiliate of Borrower) possessing experience in managing properties similar in size, scope, use and value as the Property.

"**Rents**" shall mean all rents (including, without limitation, percentage rents), rent equivalents, moneys payable as damages or in lieu of rent or rent equivalents, royalties (including, without limitation, all oil and gas or other mineral royalties and bonuses), income, receivables, receipts, revenues, deposits (including, without limitation, security, utility and other deposits), accounts, cash, issues, profits, charges for services rendered, all other amounts payable as rent under any Lease or other agreement relating to the Property, and other consideration of whatever form or nature received by or paid to or for the account of or benefit of Borrower or its agents or employees from any and all sources arising from or attributable to the Property, and proceeds, if any, from business interruption or other loss of income insurance.

"**Replacement Management Agreement**" shall mean, collectively, (a) either (i) a management agreement with a Qualified Manager substantially in the same form and substance as the Management Agreement, or (ii) a management agreement with a Qualified Manager, which management agreement shall be reasonably acceptable to Lender in form and substance, and (b) an assignment of management agreement and subordination of management fees substantially in the form then used by Lender (or of such other form and substance reasonably acceptable to Lender), executed and delivered to Lender by Borrower and such Qualified Manager at Borrower's expense.

"**Reserve Funds**" shall mean collectively, the Tax and Insurance Reserve Funds, the Interest Reserve Fund or any other escrow fund established pursuant to the Loan Documents (but not any reserve funds or accounts established pursuant to the Mortgage Loan Documents).

"**Restoration**" shall mean the repair and restoration of the Property after a Casualty or Condemnation as nearly as possible to the condition the Property was in immediately prior to such Casualty or Condemnation, with such alterations as may be reasonably approved by Lender.

"**Restricted Party**" shall mean Borrower, Principal, Mortgage Borrower, any Guarantor, or any Affiliated Manager or any shareholder, partner, member or non-member manager, or any direct or indirect legal or beneficial owner of, Borrower, Principal, Mortgage Borrower, or any Guarantor, any Affiliated Manager or any non-member manager.

"**Sale or Pledge**" shall mean a voluntary or involuntary sale, conveyance, assignment, transfer, encumbrance, pledge, grant of option or other disposal of a legal or beneficial interest, whether direct or indirect.

"**Securities**" shall mean any stock, shares, voting trust certificates, bonds, debentures, options, warrants, notes, or other evidences of indebtedness, secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "securities" or any certificates of interest, shares or participations in temporary or interim certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing.

"**Servicer**" shall have the meaning set forth in Section 9.6 hereof.

"**Servicing Agreement**" shall have the meaning set forth in Section 9.6 hereof.

"**Severed Loan Documents**" shall have the meaning set forth in Section 8.2(b) hereof.

"**Special Purpose Entity**" shall mean a corporation, limited partnership or limited liability company that since the date of its formation and at all times on and after the date thereof, has complied with and shall at all times comply with the following requirements:

(i)    has not entered into, and shall not enter into any transaction of merger or consolidation, or liquidate or dissolve itself (or suffer any liquidation or dissolution), or acquire by purchase or otherwise all or substantially all the business or assets of, or stock or other evidence of beneficial ownership of, any Person;

(ii)    has not and shall not guarantee or otherwise become liable on or in connection with any obligation of any other Person;

(iii)    if such Person is Borrower, such Person has not engaged and shall not engage, directly or indirectly, in any business other than the ownership, management and operation of the Collateral and has been and shall remain organized solely for the purpose of the ownership, management and operation of the Collateral;

(iv)    if such Person is a Borrower, such Person has not incurred and shall not incur any indebtedness, secured or unsecured, direct or contingent (including any Contingent Obligation), other than the Loan;

(v)    has not made and shall not make any loans or advances to any third party and has not acquired, and will not acquire, obligations or securities of its partners, members or shareholders;

(vi)    has been and expects to remain solvent and pay its own liabilities, Indebtedness and obligations of any kind, including all administrative expenses, as the same shall become due; has paid its own liabilities from its own separate assets, and shall pay all such liabilities, Indebtedness and obligations from its own separate assets, and has maintained and will maintain a sufficient number of employees, if any, in light of its contemplated business operations;

(vii)    has done or caused to be done and shall do all things necessary to preserve its existence, and shall not, nor will any member, partner or shareholder,  amend, modify or otherwise change its articles of organization, certificate of formation, articles or certificate of incorporation, bylaws, partnership agreement, limited liability company agreement or operating agreement in a manner which adversely affects each such Person's existence as a single purpose entity;

(viii)    has conducted and shall conduct and operate its business generally as presently conducted and operated subject to such operational changes as may be reasonably necessary or appropriate to maintain the Collateral or cause the Mortgage Borrower to maintain the Property;

(ix)    has maintained and shall maintain bank accounts separate from any other Person;

(x)    has maintained and shall maintain separate books and records and shall prepare separate financial statements which are not consolidated or combined with the financial statements of any other Person, and has filed and will file its own tax returns, except to the extent that it has been or is required or permitted to file consolidated tax returns by law;

(xi)    has not, and at all times shall not hold itself out to the public or any other Persons, as being other than, a legal entity separate and distinct from any other Person (including any Affiliate);

(xii)    has been, currently is and expects to be at all times adequately capitalized for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations;

(xiii)    has not sought and shall not seek its dissolution or winding up, in whole or in part;

(xiv) has not commingled and shall not commingle its funds and assets with those of any other Person;

(xv) if such Person is Borrower, such Person has not sold, encumbered or otherwise disposed of, and shall not sell, encumber or otherwise dispose of, all or substantially all of the Collateral;

(xvi) has observed and will continue to observe all, as applicable, corporate, limited partnership or limited liability company formalities;

(xvii) has not and will not fail to correct any known misunderstandings regarding its separate identity;

(xviii) has kept and shall keep its assets separately identified, maintained and segregated (this restriction requires, among other things, that entity funds shall not be commingled with those of any Affiliate or any other Person, that no funds of a Borrower will be distributed, loaned or otherwise transferred to any Person except for returns of capital or distributions which are properly authorized by requisite partnership, corporate or limited liability company action and reflected in the books and records of all applicable parties) and has maintained and shall maintain all accounts in its own name and with its own tax identification number, separate from those of any Affiliates or any other Person;

(xix) has not had, does not have and will not have any assets other than those related to the Collateral or its limited liability company interest in the limited liability company that owns the Property or acts as the general partner or sole member thereof, as applicable;

(xx) has allocated and will allocate fairly and reasonably any overhead expenses that are shared with any Affiliate, including, but not limited to, paying for shared office space and services performed by any employee of an Affiliate;

(xxi) has maintained and used, now maintains and uses and will maintain and use separate stationery, invoices and checks bearing its name. The stationery, invoices, and checks utilized by the Special Purpose Entity or utilized to collect its funds or pay its expenses, have borne and shall bear its own name, and have not borne and shall not bear the name of any other entity unless such entity is clearly designated as being the Special Purpose Entity's agent;

(xxii) has not pledged and will not pledge its assets for the benefit of any other Person, except as expressly provided for in the Loan Documents;

(xxiii) has not identified and will not identify its partners, members or shareholders, or any Affiliate of any of them, as a division or part of it, and has not identified itself and shall not identify itself as a division of any other Person;

(xxiv) has not entered into or been a party to, and will not enter into or be a party to, any transaction with its partners, members, shareholders or Affiliates except (i) in the

ordinary course of its business and on terms which are intrinsically fair, commercially reasonable and are no less favorable to it than would be obtained in a comparable arm's-length transaction with a third party that is not an Affiliate and (ii) in connection with this Agreement and the other Loan Documents;

(xxv) has not had and will not have any obligation to indemnify, and has not indemnified and will not, indemnify its partners, officers, directors, members, or Affiliates, as the case may be, unless such an obligation was and is fully subordinated to the Debt and will not constitute a claim against the Debt in the event that cash flow in excess of the amount required to pay the Debt is insufficient to pay such obligation to indemnify;

(xxvi) does not and will not have any of its obligations guaranteed by any Affiliate, except pursuant to the Loan Documents; and

(xxvii) has complied and will comply with all of the terms and provisions contained in its organizational documents. The statement of facts contained in its organizational documents are true and correct and will remain true and correct.

"**Tax Reserve Fund**" shall have the meaning set forth in Section 7.2.1 hereof.

"**Taxes**" shall mean all real estate and personal property taxes, and vault charges and all other taxes, levies, assessments and other similar charges, general and special, ordinary and extraordinary, foreseen and unforeseen, of every kind and nature whatsoever, which at any time prior to, at or after the execution hereof may be assessed, levied or imposed by, in each case, a Governmental Authority upon the Property or upon the ownership, use, occupancy or enjoyment thereof, and any interest, cost or penalties imposed by such Governmental Authority with respect to any of the foregoing. Taxes shall not include any sales or use taxes or any income taxes payable by Borrower or Mortgage Borrower.

"**Title Insurance Policy**" shall mean the ALTA mortgagee title insurance policy issued by Commonwealth Land Title Insurance Company with respect to the Property and insuring the lien of the Mortgage encumbering the Property.

"**Transfer**" shall have the meaning set forth in Section 5.2.10 hereof.

"**UCC**" or "**Uniform Commercial Code**" shall mean the Uniform Commercial Code as in effect in the State in which the Property is located.

"**UCC Title Insurance Policy**" shall have the meaning set forth in Section 3.1.3(b) hereof.

**Section 1.2    Principles of Construction.** All references to sections and schedules are to sections and schedules in or to this Agreement unless otherwise specified. All uses of the word "including" shall mean "including, without limitation" unless the context shall indicate otherwise. Unless otherwise specified, the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. Unless otherwise specified, all

meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined. With respect to terms defined by cross-reference to the Mortgage Loan Documents, such defined terms shall have the definitions set forth in the Mortgage Loan Documents, as of the date hereof, and no modifications to the Mortgage Loan Documents, shall have the effect of changing such definitions for the purposes of this Agreement unless Lender expressly agrees that such definitions as used in this Agreement have been revised. Notwithstanding anything stated herein to the contrary, any provisions in this Agreement cross-referencing provisions of the Mortgage Loan Agreement shall be effective notwithstanding the termination of the Mortgage Loan Agreement by payment in full of the Mortgage Loan or otherwise.

## II.   GENERAL TERMS

### Section 2.1   Loan Commitment; Disbursement to Borrower.

**2.1.1   Agreement to Lend and Borrow.** Subject to and upon the terms and conditions set forth herein, Lender hereby agrees to make and Borrower hereby agrees to accept the Loan on the Closing Date.

**2.1.2   Single Disbursement to Borrower.** Borrower may request and receive only one borrowing hereunder in respect of the Loan and any amount borrowed and repaid hereunder in respect of the Loan may not be reborrowed.

**2.1.3   The Note, Pledge Agreement and Loan Documents.** The Loan shall be evidenced by the Note and secured by, among other things, the Pledge Agreement and the other Loan Documents.

**2.1.4   Use of Proceeds.** Borrower shall use the proceeds of the Loan to (a) repay and discharge any existing loans relating to the Collateral, (b) make an equity contribution (if necessary) to Mortgage Borrower in order to cause Mortgage Borrower to use such amounts for any use permitted pursuant to the Mortgage Loan Documents, including, without limitation, to acquire the Property and to pay all past-due Basic Carrying Costs, if any, with respect to the Property, (c) make deposits into the Reserve Funds on the Closing Date in the amounts provided herein, if required, (d) pay costs and expenses incurred in connection with the closing of the Loan, as approved by Lender, (e) fund any working capital requirements of the Property and (f) distribute the balance, if any, to Mortgage Borrower.

### Section 2.2   Interest Rate.

**2.2.1   Interest Rate.** Interest on the outstanding principal balance of the Loan shall accrue from the Closing Date to but excluding the Maturity Date at the Interest Rate. Borrower shall pay to Lender on each Payment Date the interest accrued on the Loan for the preceding Interest Period.

**2.2.2   Intentionally Omitted.**

**2.2.3   Interest Calculation.** Interest on the outstanding principal balance of the Loan shall be calculated by multiplying (a) the actual number of days elapsed in

the period for which the calculation is being made by (b) a daily rate based on a three hundred sixty (360) day year by (c) the Outstanding Principal Balance.

**2.2.4    Default Rate**.  In the event that, and for so long as, any Event of Default shall have occurred and be continuing beyond any applicable cure periods, the Outstanding Principal Balance and, to the extent permitted by law, all accrued and unpaid interest in respect of the Loan and any other amounts due pursuant to the Loan Documents, shall accrue interest at the Default Rate, calculated from the date such payment was due without regard to any grace or cure periods contained herein.

**2.2.5    Usury Savings**.  This Agreement, the Note and the other Loan Documents are subject to the express condition that at no time shall Borrower be obligated or required to pay interest on the principal balance of the Loan at a rate which could subject Lender to either civil or criminal liability as a result of being in excess of the Maximum Legal Rate.  If, by the terms of this Agreement or the other Loan Documents, Borrower is at any time required or obligated to pay interest on the principal balance due hereunder at a rate in excess of the Maximum Legal Rate, the Interest Rate or the Default Rate, as the case may be, shall be deemed to be immediately reduced to the Maximum Legal Rate and all previous payments in excess of the Maximum Legal Rate shall be deemed to have been payments in reduction of principal and not on account of the interest due hereunder.  All sums paid or agreed to be paid to Lender for the use, forbearance, or detention of the sums due under the Loan, shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan until payment in full so that the rate or amount of interest on account of the Loan does not exceed the Maximum Legal Rate of interest from time to time in effect and applicable to the Loan for so long as the Loan is outstanding.

**Section 2.3    Loan Payment**.

**2.3.1    Payments**.  Borrower shall pay to Lender (a) on the Closing Date, an amount equal to interest only on the Outstanding Principal Balance from the Closing Date up to but not including the first Payment Date following the Closing Date, and (b) on each Payment Date thereafter until the Maturity Date, Borrower shall pay to Lender interest only at the Interest Rate on the Outstanding Principal Balance of the Loan for the applicable Interest Period (the "**Monthly Payment**").  Pursuant to Section 3.2(a) of the Mortgage Loan Agreement, the Mortgage Lender will make advances in the aggregate amount of $700,000 (the "**Mezzanine Debt Service Advances**") to Mortgage Borrower for the purpose of making the Monthly Payments required hereunder.  Borrower shall use its best efforts to cause Mortgage Borrower to cause Mortgage Lender to make the Mezzanine Debt Service Advances directly to Lender on behalf of Borrower as and when the Monthly Payments become due under this Agreement.  Borrower agrees and acknowledges that the agreement of Mortgage Lender to make the Mezzanine Debt Service Advances (whether directly to Lender or otherwise) shall not constitute a limitation on the obligation of Borrower to pay the Debt Service under this Agreement.  From and after the time that the Mezzanine Debt Service Advances are advanced in full, the Monthly Payments shall be disbursed by Lender from the Interest Reserve as provided in Section 7.1.2 below.

**2.3.2   Payment on Maturity Date.**  Borrower shall pay to Lender on the Maturity Date the Outstanding Principal Balance, all accrued and unpaid interest and all other amounts due hereunder and under the Note, the Pledge Agreement and the other Loan Documents.

**2.3.3   Late Payment Charge.**  If any principal, interest or any other sums due under the Loan Documents, other than the payment of the Outstanding Principal Balance due on the Maturity Date, is not paid by Borrower by the date on which it is due, Borrower shall pay to Lender upon demand an amount equal to the lesser of (a) five percent (5%) of such unpaid sum, and (b) the maximum amount permitted by applicable law, in order to defray the expense incurred by Lender in handling and processing such delinquent payment and to compensate Lender for the loss of the use of such delinquent payment.  Any such amount shall be secured by the Pledge Agreement and the other Loan Documents to the extent permitted by applicable law.  Notwithstanding the foregoing, so long as there are sufficient funds in the Interest Reserve Account and the Monthly Payments are being disbursed from the Interest Reserve Account pursuant to <u>Section 7.1.2</u> below, no such late payment charge shall be incurred due to Lender's failure to timely draw such payments.

**2.3.4   Method and Place of Payment.**  Except as otherwise specifically provided herein, all payments and prepayments under this Agreement and the Note shall be made to Lender not later than 3:00 P.M., New York City time, on the date when due and shall be made in lawful money of the United States of America in immediately available funds at Lender's office or as otherwise directed by Lender, and any funds received by Lender after such time shall, for all purposes hereof, be deemed to have been paid on the next succeeding Business Day.

**2.3.5   Payments Generally.**  For purposes of making payments hereunder, but not for purposes of calculating Interest Periods, if the day on which such payment is due is not a Business Day, then amounts due on such date shall be due on the immediately preceding Business Day and, with respect to payments of principal due on the Maturity Date, interest shall be payable at the Interest Rate or the Default Rate, as the case may be, through and including the day immediately preceding such Maturity Date.  All amounts due pursuant to this Agreement and the other Loan Documents shall be payable without setoff, counterclaim, defense or any other deduction whatsoever.

**Section 2.4   Prepayments.**

**2.4.1   Voluntary Prepayments.**  On any Business Day, Borrower may, at any time, elect to prepay the Loan, in whole (but not in part), and without any penalty or premium, <u>provided</u> that (a) Borrower has given Lender written notice of such prepayment not less than fifteen (15) days prior to the date it is to be made (a "**Prepayment Date**") and (b) such prepayment is accompanied by all interest accrued on the amount so prepaid and all other fees and other sums due hereunder and under the other Loan Documents up to and including the date of prepayment, if any.

**2.4.2   Intentionally Omitted.**

**2.4.3   Intentionally Omitted.**

### 2.4.4    Liquidation Events.

(a)    In the event of (i) any Casualty to all or any portion of the Property, (ii) any Condemnation of all or any portion of the Property, (iii) a Transfer of all or any portion of the Property in connection with the realization thereon following a Mortgage Loan Event of Default beyond any applicable cure periods, or (iv) the receipt by Mortgage Borrower of any excess proceeds realized under its owner's title insurance policy after application of such proceeds by Mortgage Borrower to cure any title defect (each, a "**Liquidation Event**"), Borrower shall cause the related Net Liquidation Proceeds After Debt Service to be deposited directly with Lender.  On each date on which Lender actually receives a distribution of Net Liquidation Proceeds After Debt Service, Borrower shall prepay the outstanding principal balance of the Note in an amount equal to one hundred percent (100%) of such Net Liquidation Proceeds After Debt Service, together with interest through the date of such payment.  Any amounts of Net Liquidation Proceeds After Debt Service in excess of the Debt shall be paid to Borrower.  Any prepayment received by Lender pursuant to this Section 2.4.4(a) on a date other than a Payment Date shall be held by Lender as collateral security for the Loan in an interest bearing account, with such interest accruing to the benefit of Borrower, and shall be applied by Lender on the next Payment Date.

(b)    Borrower shall promptly notify Lender of any Liquidation Event once Borrower has knowledge of such event.  Borrower shall be deemed to have knowledge of (i) a sale (other than a foreclosure sale) of the Property on the date on which a contract of sale for such sale is entered into, and a foreclosure sale, on the date notice of such foreclosure sale is given, and (ii) a refinancing of the Property, on the date on which a commitment for such refinancing has been entered into.  The provisions of this Section 2.4.4 shall not be construed to contravene in any manner the restrictions and other provisions regarding refinancing of the Mortgage Loan or Transfer of the Property set forth in this Agreement, the other Loan Documents and the Mortgage Loan Documents.

**Section 2.5    Intentionally Omitted.**

**Section 2.6    Release of Collateral.**  Except as set forth in Section 2.7, no repayment, prepayment of all or any portion of the Note shall cause, give rise to a right to require, or otherwise result in, the release of the Lien of the Pledge Agreement on the Collateral.

**Section 2.7    Release on Payment in Full.**  Lender shall, upon the written request of Borrower, upon payment in full of all principal and interest due on the Loan and all other amounts due and payable under the Loan Documents in accordance with the terms and provisions of the Note, and this Agreement and the other Loan Documents, release the Lien of the Pledge Agreement on the Collateral or, upon the written request and at the expense of Borrower, assign the Note and Pledge Agreement, each without recourse, covenant or warranty of any nature, express or implied, to a new lender designated by Borrower provided Borrower shall submit to Lender, not less than five (5) Business Days prior to the Payment Date on which Borrower intends to pay the Loan in full, a release of Lien (and related Loan Documents) for the Collateral for execution by Lender.  Such release shall be in a form appropriate in each jurisdiction in which the Collateral or Borrower, as appropriate, is located and that would be satisfactory to a prudent lender.

**Section 2.8**     **Cash Management**.

    **2.8.1**    **Operating Account**. Borrower shall cause Mortgage Borrower to establish and maintain a single bank account at an Eligible Institution which shall be the Operating Account into which all Gross Income form Operations and Booking Deposits shall be directly deposited within two (2) Business Days after receipt thereof by Borrower, Mortgage Borrower, Manager or any of such party's Affiliates. Until so deposited, any Gross Income from Operations and Booking Deposits that are held by Borrower, Mortgage Borrower, Manager or any of their respective Affiliates shall be held in trust by such Person for the benefit of Lender, subject to the rights of Mortgage Lender under the Mortgage Loan Documents. Notwithstanding any provisions contained in the Management Agreement to the contrary, Borrower will cause Mortgage Borrower to cause Manager to deposit all amounts payable to Mortgage Borrower pursuant to the Management Agreement directly into the Operating Account. No funds of Mortgage Borrower shall be commingled with any other funds, including without limitation, other funds held by Manager. All Gross Income from Operations and Booking Deposits shall be billed and collected in the name of Mortgage Borrower and in no other name. So long as there is no Default hereunder or under the Mortgage Loan Documents, and no Default shall be created thereby, disbursements may be made from the Operating Account to pay Operating Expenses then authorized under the Approved Budget.

    **2.8.2**    **Payroll Account**. Borrower may cause Mortgage Borrower to maintain at an Eligible Institution a segregated account for payroll and other employee payments included in expenses. Such account shall be funded by transfers from the Operating Account and shall be used solely for payments to employees in accordance with the terms of the Mortgage Loan Agreement.

    **2.8.3**    **Application and Use of Cash Flow**Payments from the Operating Account shall be made only in accordance with Section 6.5 of the Mortgage Loan Agreement.

**III.**     **CONDITIONS PRECEDENT**

    **Section 3.1**    **Conditions Precedent to Closing**. The obligation of Lender to make the Loan hereunder is subject to the fulfillment by Borrower or waiver by Lender of the following conditions precedent no later than the Closing Date:

    **3.1.1**    **Representations and Warranties; Compliance with Conditions**. The representations and warranties of Borrower contained in this Agreement and the other Loan Documents shall be true and correct in all material respects on and as of the Closing Date with the same effect as if made on and as of such date, and no Event of Default shall have occurred and be continuing beyond any applicable cure periods; and Borrower shall be in compliance in all material respects with all terms and conditions set forth in this Agreement and in each other Loan Document on its part to be observed or performed.

    **3.1.2**    **Loan Agreement and Note**. Lender shall have received a copy of this Agreement and the Note, in each case, duly executed and delivered on behalf of Borrower.

    **3.1.3**    **Delivery of Loan Documents; UCC Title Insurance; Reports; Leases**.

(a)    **Pledge Agreement**.  Lender shall have received from Borrower fully executed and acknowledged (where applicable) counterparts of the Pledge Agreement, the UCC Financing Statements and such other documents required pursuant to the Pledge Agreement, in the reasonable judgment of Lender, so as to effectively create valid and enforceable Liens upon the Collateral, of first priority, in favor of Lender, subject only to the Permitted Encumbrances and such other Liens as are permitted pursuant to the Loan Documents. Lender shall have also received from Borrower fully executed counterparts of the Environmental Indemnity, the Guaranty and the other Loan Documents.

(b)    **UCC Title Insurance**.  Lender shall have received a UCC Title Insurance Policy (the "**UCC Title Insurance Policy**") issued by a title company acceptable to Lender and dated as of the Closing Date, with reinsurance and direct access agreements acceptable to Lender.  Such UCC Title Insurance Policy shall (i) provide coverage in amounts reasonably satisfactory to Lender, (ii) insure Lender that the Pledge Agreement and the documents executed and/or delivered in connection therewith create a valid lien on the Collateral encumbered thereby of first priority, free and clear of all exceptions from coverage other than the Permitted Encumbrances and standard exceptions and exclusions from coverage (as modified by the terms of any endorsements), (iii) contain such endorsements and affirmative coverages as Lender may reasonably request, and (iv) name Lender, its successors and assigns, as the insured. The UCC Title Insurance Policy shall be assignable.  Lender also shall have received evidence that all premiums in respect of such Title Insurance Policy have been paid.

(c)    **Survey**.  Lender shall have received a current survey, certified to the title company and Lender and their successors and assigns, in form and content satisfactory to Lender and prepared by a professional and properly licensed land surveyor satisfactory to Lender.   The survey shall be prepared in accordance with (i) the Accuracy Standards for ALTA/ACSM Land Title Surveys as adopted by ALTA, American Congress on Surveying & Mapping and National Society of Professional Surveyors or (ii) the standard as-built survey requirements which is customarily accepted by institutional lenders making loans on similar properties in New York County, New York and otherwise reasonably acceptable to Lender. The survey shall reflect the same legal description contained in the Title Insurance Policy and shall include, among other things, a metes and bounds description of the real property comprising part of the Property reasonably satisfactory to Lender.  The surveyor's seal shall be affixed to the survey and the surveyor shall provide a certification for the survey in form and substance reasonably acceptable to Lender.

(d)    **Insurance**.   Lender shall have received valid certificates of insurance for the Policies required under the Mortgage Loan Documents, satisfactory to Lender in its sole discretion, and evidence of the payment of all Insurance Premiums payable for the existing policy period.

(e)    **Encumbrances**.  Borrower shall have taken or caused to be taken such actions in such a manner so that Lender has a valid and perfected first priority Lien as of the Closing Date with respect to the Collateral (subject only to the filing of the UCC Financing Statements with respect to the Pledge Agreement, and Lender shall have received satisfactory evidence thereof).

(f)    **Public Records Searches**.    Lender shall have received UCC, bankruptcy, judgment lien, pending litigation, bankruptcy and state and federal tax lien public records searches for Borrower, Mortgage Borrower, Principal, Manager and Guarantor reasonably satisfactory to Lender.

(g)    **Mortgage Loan Documents**.    The Mortgage Loan Documents shall have been duly authorized, executed and delivered by all parties thereto, the Mortgage Loan shall have been contemporaneously funded with the funding of this Loan and Lender shall have received and approved copies thereof.    All of the conditions precedent set forth in Section 3 of the Mortgage Loan Agreement shall have been satisfied and the Mortgage Loan shall have closed and been fully advanced in accordance with the Mortgage Loan Agreement.

**3.1.4    Related Documents**.    Each additional document not specifically referenced herein, but relating to the transactions contemplated herein, shall be in form and substance reasonably satisfactory to Lender, and shall have been duly authorized, executed and delivered by all parties thereto and Lender shall have received and approved certified copies thereof.

**3.1.5    Delivery of Organizational Documents**.    On or before the Closing Date, Borrower shall deliver or cause to be delivered to Lender copies certified by Borrower of all organizational documentation related to Borrower, Mortgage Borrower and/or the formation, structure, existence, good standing and/or qualification to do business of Borrower and Mortgage Borrower, as Lender may request in its sole discretion, including, without limitation, good standing certificates, qualifications to do business in the appropriate jurisdictions, resolutions authorizing the entering into of the Loan and the Mortgage Loan and incumbency certificates as may be requested by Lender.

**3.1.6    Opinions of Borrower's Counsel**.    Lender shall have received opinions from Borrower's counsel with respect to perfection of the Collateral and the due execution, authority, enforceability of the Loan Documents and such other matters as Lender may require, all such opinions in form, scope and substance satisfactory to Lender and Lender's counsel in their sole discretion.

**3.1.7    Intentionally Omitted**.

**3.1.8    Basic Carrying Costs**.    Borrower shall have caused Mortgage Borrower to have paid all Basic Carrying Costs relating to the Property which are in arrears, including without limitation, (a) accrued but unpaid Insurance Premiums, (b) currently due Taxes (including any in arrears), and (c) currently due Other Charges.

**3.1.9    Completion of Proceedings**.    All corporate and other proceedings taken or to be taken in connection with the transactions contemplated by this Agreement and the other Loan Documents and all documents incidental thereto shall be satisfactory in form and substance to Lender, and Lender shall have received all such counterpart originals or certified copies of such documents as Lender may reasonably request.

10728081.5

**3.1.10 Payments**. All payments, deposits or escrows required to be made or established by Borrower under this Agreement, the Note and the other Loan Documents on or before the Closing Date shall have been paid.

**3.1.11 Transaction Costs**. Borrower shall have paid or reimbursed Lender for all UCC Title Insurance Policy premiums, recording and filing fees, the fees and costs of Lender's counsel and all other third party out-of-pocket expenses incurred in connection with the origination of the Loan.

**3.1.12 Bankruptcy**. Neither Borrower, Mortgage Borrower nor any of its constituent Persons shall be the subject of any bankruptcy, reorganization, or insolvency proceeding.

**3.1.13 Leases**. Lender shall have received copies of all Leases and certified copies of any Leases as requested by Lender.

**3.1.14 Tax Lot**. Lender shall have received evidence that the Property constitutes one (1) or more separate tax lots, which evidence shall be reasonably satisfactory in form and substance to Lender.

**3.1.15 Management Agreement**. Lender shall have received a certified copy of the Management Agreement.

**3.1.16 Further Documents**. Lender or its counsel shall have received such other and further approvals, opinions, documents and information as Lender or its counsel may have reasonably requested including the Loan Documents in form and substance satisfactory to Lender and its counsel.

## IV.  REPRESENTATIONS AND WARRANTIES

**Section 4.1    Borrower Representations**. Borrower represents and warrants as of the date hereof and as of the Closing Date that:

**4.1.1 Organization**. Borrower has been duly organized and is validly existing and in good standing with requisite power and authority to own the Collateral and to transact the businesses in which it is now engaged. Borrower is duly qualified to do business and is in good standing in each jurisdiction where it is required to be so qualified in connection with its properties, businesses and operations. Borrower possesses all rights, licenses, permits and authorizations, governmental or otherwise, necessary to entitle it to own the Collateral and to transact the businesses in which it is now engaged, and the sole business of Borrower is the ownership, management and operation of the Collateral. The ownership interests of Borrower are as set forth on the organizational chart attached hereto as Schedule I. As of the date hereof, the structural chart of Borrower set forth on Schedule I attached hereto is true, complete and correct in all respects. As of the date hereof, no Person other than those Persons shown on Schedule I annexed hereto have any direct or indirect ownership interest in, or right to control, directly or indirectly, Borrower.

**4.1.2    Proceedings**. Borrower has taken all necessary action to authorize the execution, delivery and performance of this Agreement and the other Loan Documents. This Agreement and such other Loan Documents have been duly executed and delivered by or on behalf of Borrower and constitute legal, valid and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms, subject only to applicable bankruptcy, insolvency and similar laws affecting rights of creditors generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

**4.1.3    No Conflicts**. The execution, delivery and performance of this Agreement and the other Loan Documents by Borrower will not conflict with or result in a breach of any of the terms or provisions of, or constitute a default under, or result in the creation or imposition of any lien, charge or encumbrance (other than pursuant to the Loan Documents) upon any of the property or assets of Borrower pursuant to the terms of any indenture, mortgage, deed of trust, loan agreement, partnership agreement, management agreement or other agreement or instrument to which Borrower is a party or by which any of Borrower's property or assets is subject, nor will such action result in any violation of the provisions of any statute or any order, rule or regulation of any Governmental Authority having jurisdiction over Borrower or any of Borrower's properties or assets, and any consent, approval, authorization, order, registration or qualification of or with any Governmental Authority required for the execution, delivery and performance by Borrower of this Agreement or any other Loan Documents has been obtained and is in full force and effect.

**4.1.4    Litigation**. There are no actions, suits or proceedings at law or in equity by or before any Governmental Authority or other agency now pending or, to Borrower's knowledge, threatened against or affecting Borrower, Mortgage Borrower, Principal, Guarantor, the Collateral or the Property.

**4.1.5    Agreements**. Borrower is not a party to any agreement or instrument or subject to any restriction which might materially and adversely affect Borrower, Mortgage Borrower or the Property, or Borrower's or Mortgage Borrower's business, properties or assets, operations or condition, financial or otherwise. Borrower has not received notice that it is in default in any material respect in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any agreement or instrument to which it is a party or by which Borrower, Mortgage Borrower, the Collateral or the Property are bound. Borrower has no material financial obligation under any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which Borrower is a party or by which Borrower, Mortgage Borrower, the Collateral or the Property is otherwise bound, other than obligations under the Loan Documents.

**4.1.6    Title**. Borrower is the record and beneficial owner of, and Borrower has good and insurable title to the Collateral, free and clear of all Liens whatsoever except the Liens created by the Loan Documents. The Permitted Encumbrances in the aggregate do not materially and adversely affect the value, operation or use of the Collateral or the Property (as currently used) or Borrower's ability to repay the Loan. The Pledge Agreement, together with the UCC Financing Statements relating to the Collateral, will create a valid lien on, and security interest in and to, the Collateral, all in accordance with the terms thereof. There are no

claims for payment for work, labor or materials affecting the Property which are or may become
a lien prior to, or of equal priority with, the Liens created by the Mortgage Loan Documents.

### 4.1.7  Solvency.

Borrower (a) has not entered into the transaction or
executed the Note, this Agreement or any other Loan Documents with the actual intent to hinder,
delay or defraud any creditor and (b) received reasonably equivalent value in exchange for its
obligations under such Loan Documents. Giving effect to the Loan, the fair saleable value of
Borrower's assets exceeds and will, immediately following the making of the Loan, exceed
Borrower's total liabilities, including, without limitation, subordinated, unliquidated, disputed
and contingent liabilities. The fair saleable value of Borrower's assets is and will, immediately
following the making of the Loan, be greater than Borrower's liabilities, including the maximum
amount of its contingent liabilities on its debts as such debts become absolute and matured.
Borrower's assets do not and, immediately following the making of the Loan will not, constitute
unreasonably small capital to carry out its business as conducted or as proposed to be conducted.
Borrower does not intend to, and does not believe that it will, incur debt and liabilities (including
contingent liabilities and other commitments) beyond its ability to pay such debt and liabilities as
they mature (taking into account the timing and amounts of cash to be received by Borrower and
the amounts to be payable on or in respect of obligations of Borrower). No petition in
bankruptcy has been filed against Borrower, Mortgage Borrower or any respective constituent
Person, and none of Borrower, Mortgage Borrower nor any respective constituent Person has
ever made an assignment for the benefit of creditors or taken advantage of any insolvency act for
the benefit of debtors. None of Borrower, Mortgage Borrower, nor any of their respective
constituent Persons are contemplating either the filing of a petition by it under any state or
federal bankruptcy or insolvency laws or the liquidation of all or a major portion of Borrower's
or Mortgage Borrower's assets or property, and Borrower has no knowledge of any Person
contemplating the filing of any such petition against it, Mortgage Borrower or such constituent
Persons.

### 4.1.8  Full and Accurate Disclosure.

No statement of fact made by
Borrower in this Agreement or in any of the other Loan Documents contains any untrue
statement of a material fact or omits to state any material fact necessary to make statements
contained herein or therein not misleading. There is no material fact presently known to
Borrower with respect to Borrower or the Property which has not been disclosed to Lender
which adversely affects, nor as far as Borrower can foresee, could reasonably be expected to
adversely affect, the Property, the Collateral or the business, operations or condition (financial or
otherwise) of Borrower.

### 4.1.9  No Plan Assets.

Borrower does not sponsor, is not obligated to
contribute to, and is not itself an "employee benefit plan," as defined in Section 3(3) of ERISA,
subject to Title I of ERISA or Section 4975 of the Code, and none of the assets of Borrower
constitutes or will constitute "plan assets" of one or more such plans within the meaning of
29 C.F.R. Section 2510.3-101. In addition, (a) Borrower is not a "governmental plan" within the
meaning of Section 3(32) of ERISA and (b) transactions by or with Borrower are not subject to
any state or other statute, regulation or other restriction regulating investments of, or fiduciary
obligations with respect to, governmental plans within the meaning of Section 3(32) of ERISA
which is similar to the provisions of Section 406 of ERISA or Section 4975 of the Code and
which prohibit or otherwise restrict the transactions contemplated by this Loan Agreement

including, but not limited to, the exercise by Lender of any of its rights under the Loan Documents.

**4.1.10 Compliance**. Borrower and the Collateral comply in all material respects with all applicable Legal Requirements. Borrower is not in default or violation of any order, writ, injunction, decree or demand of any Governmental Authority. There has not been committed by Borrower, Mortgage Borrower or to the knowledge of Borrower, any other Person in occupancy of or involved with the operation or use of the Property any act or omission affording any Governmental Authority the right of forfeiture as against the Property or any part thereof or any monies paid in performance of Borrower's obligations under any of the Loan Documents.

**4.1.11 Financial Information**. Except for Permitted Encumbrances, Borrower does not have any contingent liabilities, liabilities for taxes, unusual forward or long-term commitments or unrealized or anticipated losses from any unfavorable commitments that are known to Borrower and reasonably likely to have a materially adverse effect on the Property or the operation thereof.

**4.1.12 Condemnation**. No Condemnation or other proceeding has been commenced or, to Borrower's best knowledge, is threatened or contemplated with respect to all or any portion of the Property or for the relocation of roadways providing access to the Property.

**4.1.13 Federal Reserve Regulations**. No part of the proceeds of the Loan will be used for the purpose of purchasing or acquiring any "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System or for any other purpose which would be inconsistent with such Regulation U or any other Regulations of such Board of Governors, or for any purposes prohibited by Legal Requirements or by the terms and conditions of this Agreement or the other Loan Documents.

**4.1.14 Utilities and Public Access**. The Property has rights of access to public ways and is served by water, sewer, sanitary sewer and storm drain facilities adequate to service the Property for its intended uses. All public utilities necessary or convenient to the full use and enjoyment of the Property are located either in the public right-of-way abutting the Property (which are connected so as to serve the Property without passing over other property) or in recorded easements serving the Property and such easements are set forth in and insured by the Title Insurance Policy. All roads necessary for the use of the Property for its current purpose have been completed and dedicated to public use and accepted by all Governmental Authorities.

**4.1.15 Not a Foreign Person**. Borrower is not a "foreign person" within the meaning of §1445(f)(3) of the Code.

**4.1.16 Separate Lots**. The Property is comprised of one (1) or more parcels, each of which constitutes a separate tax parcel or parcels and none of which constitutes a portion of any other tax parcel not a part of the Property.

**4.1.17 Assessments**. There are no pending or proposed special or other assessments for public improvements or otherwise affecting the Property, nor are there any contemplated improvements to the Property that may result in such special or other assessments.

**4.1.18  Enforceability**.  The Loan Documents are not subject to any right of rescission, set-off, counterclaim or defense by Borrower, Mortgage Borrower, Principal or Guarantor including the defense of usury, nor, to Borrower's knowledge, would the operation of any of the terms of the Loan Documents, or the exercise of any right thereunder, render the Loan Documents unenforceable (subject to principles of equity and bankruptcy, insolvency and other laws generally affecting creditors' rights and the enforcement of debtors' obligations), and Borrower, Principal and Guarantor have not asserted any right of rescission, set-off, counterclaim or defense with respect thereto.

**4.1.19  No Prior Assignment**.  There are no prior assignments of the Leases or any portion of the Rents due and payable or to become due and payable which are presently outstanding.

**4.1.20  Insurance**.  Borrower has obtained and has delivered to Lender certified copies of all insurance policies reflecting the insurance coverages, amounts and other requirements set forth in this Agreement. No claims have been made under any such policy, and Borrower has not, by act or omission, caused anything which would impair the coverage of any such policy.

**4.1.21  Use of Property**.  The Property is used exclusively as a hotel with related improvements and amenities.

**4.1.22  Mortgage Loan Representations and Warranties**.  All of the representations and warranties contained in the Mortgage Loan Documents are hereby incorporated into this Agreement and deemed made hereunder as and when made thereunder and shall remain incorporated without regard to any waiver, amendment or other modification thereof by the Mortgage Lender or to whether the related Mortgage Loan Document has been repaid, defeased or otherwise terminated, unless otherwise consented to in writing by Lender.

**4.1.23  No Contractual Obligations**.  Other than the Loan Documents, as of the date of this Agreement, Borrower is not subject to any Contractual Obligations and has not entered into any agreement, instrument or undertaking by which it or its assets are bound, or has incurred any Indebtedness, and prior to the date of this Agreement, Borrower has not entered into any Contractual Obligation, or any agreement, instrument or undertaking by which it or its assets are bound or incurred any Indebtedness other than in connection with this Agreement.

**4.1.24  Affiliates**.  Effective as of the consummation of the transactions contemplated by this Agreement, the only members are as set forth in Schedule I.

**4.1.25  Intentionally Omitted**.

**4.1.26  Leases**.  The Property is not subject to any Leases other than the Leases described in Schedule II attached hereto and made a part hereof.  Mortgage Borrower is the owner and lessor of landlord's interest in the Leases. No Person has any possessory interest in the Property or right to occupy the same except under and pursuant to the provisions of the Leases. The current Leases are in full force and effect and there are no defaults thereunder by either party.  No Rent (including security deposits) has been paid more than one (1) month in advance of its due date. All tenant work required to be performed by the landlord under each

Lease has been performed as required in such Lease and has been accepted by the applicable tenant, and any payments, free rent, partial rent, rebate of rent or other payments, credits, allowances or abatements required to be given by the landlord to any tenant has already been received by such tenant. There has been no prior sale, transfer or assignment, hypothecation or pledge of any Lease or of the Rents received therein. Except as set forth on Schedule II, no tenant listed on Schedule II has assigned its Lease or sublet all or any portion of the premises demised thereby, no such tenant holds its leased premises under assignment or sublease, nor does anyone except such tenant and its employees occupy such leased premises. No tenant under any Lease has a right or option pursuant to such Lease or otherwise to purchase all or any part of the leased premises or the building of which the leased premises are a part. No tenant under any Lease has any right or option for additional space in the Improvements. To Borrower's knowledge, and except as expressly set forth in the Environmental Report, no hazardous wastes or toxic substances, as defined by applicable federal, state or local statutes, rules and regulations, have been disposed, stored or treated by any tenant under any Lease on or about the leased premises nor does Borrower have any knowledge of any tenant's intention to use its leased premises for any activity which, directly or indirectly, involves the use, generation, treatment, storage, disposal or transportation of any petroleum product or any toxic or hazardous chemical, material, substance or waste.

### 4.1.27 Intentionally Omitted.

**4.1.28 Principal Place of Business; State of Organization.** Borrower's principal place of business as of the date hereof is the address set forth in the introductory paragraph of this Agreement. The Borrower is organized under the laws of the State of New York.

**4.1.29 Filing and Recording Taxes.** All transfer taxes, deed stamps, intangible taxes or other amounts in the nature of transfer taxes required to be paid by any Person under applicable Legal Requirements currently in effect in connection with the transfer of the Collateral to Borrower have been paid. All stamp, intangible or other similar tax required to be paid by any Person under applicable Legal Requirements currently in effect in connection with the execution, delivery, recordation, filing, registration, perfection or enforcement of any of the Loan Documents, including, without limitation, the Pledge Agreement, have been paid or are being paid simultaneously herewith, and, the Pledge Agreement and other Loan Documents have been validly executed and delivered and are enforceable in accordance with its terms by Lender (or any subsequent holder thereof), subject to principles of equity and bankruptcy, insolvency and other laws generally applicable to creditors' rights and the enforcement of debtors' obligations.

### 4.1.30 Special Purpose Entity/Separateness.

(a)    Until the Debt has been paid in full, Borrower hereby represents, warrants and covenants that (i) Borrower is, shall be and shall continue to be a Special Purpose Entity and (ii) Mortgage Borrower is, shall be and shall continue to be a Special Purpose Entity.

(b)    The representations, warranties and covenants set forth in Section 4.1.30(a) shall survive for so long as any amount remains payable to Lender under this Agreement or any other Loan Document.

**4.1.31  Management Agreement**.  The Management Agreement is in full force and effect and there is no default thereunder by any party thereto and no event has occurred that, with the passage of time and/or the giving of notice, would constitute a default thereunder.

**4.1.32  Illegal Activity**.  No portion of the Property has been purchased with proceeds of any illegal activity.

**4.1.33  No Change in Facts or Circumstances; Disclosure**.    All information submitted by Borrower to Lender and in all financial statements, rent rolls, reports, certificates and other documents submitted in connection with the Loan or the Mortgage Loan or in satisfaction of the terms thereof and all statements of fact made by Borrower or Mortgage Borrower in this Agreement or in any other Loan Document or Mortgage Loan Document, are accurate, complete and correct in all material respects.  There has been no material adverse change in any condition, fact, circumstance or event that would make any such information inaccurate, incomplete or otherwise misleading in any material respect or that otherwise materially and adversely affects or might materially and adversely affect the use, operation or value of the Collateral or the Property or the business operations or the financial condition of Borrower or Mortgage Borrower.  Borrower and Mortgage Borrower have disclosed to Lender all material facts and has not failed to disclose any material fact that could cause any Provided Information or representation or warranty made herein to be materially misleading.

**4.1.34  Investment Company Act**.  Borrower is not (a) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended; (b) a "holding company" or a "subsidiary company" of a "holding company" or an "affiliate" of either a "holding company" or a "subsidiary company" within the meaning of the Public Utility Holding Company Act of 1935, as amended; or (c) subject to any other federal or state law or regulation which purports to restrict or regulate its ability to borrow money.

**4.1.35  Embargoed Person**.  At all times throughout the term of the Loan, including after giving effect to any Transfers permitted pursuant to the Loan Documents, (a) none of the funds or other assets of Borrower, Mortgage Borrower, Principal and Guarantor constitute property of, or are beneficially owned, directly or indirectly, by any person, entity or government subject to trade restrictions under U.S. law, including, but not limited to, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., the United and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56) (the Patriot Act), and any Executive Orders or regulations promulgated under any such United States laws, with the result that the investment in Borrower, Mortgage Borrower, Principal or Guarantor, as applicable (whether directly or indirectly), is or would be prohibited by law (each, an "**Embargoed Person**") or the Loan made by Lender is or would be in violation of law; (b) no Embargoed Person shall have any ownership interest of any nature whatsoever in Borrower, Mortgage Borrower, Principal or Guarantor, as applicable, with the result that the

investment in Borrower, Mortgage Borrower, Principal or Guarantor, as applicable (whether directly or indirectly), is or would be prohibited by law or the Loan is or would be in violation of law; and (c) none of the funds of Borrower, Mortgage Borrower, Principal or Guarantor, as applicable, shall be derived from any unlawful activity with the result that the investment in Borrower, Mortgage Borrower, Principal or Guarantor, as applicable (whether directly or indirectly), is or would be prohibited by law or the Loan is or would be in violation of law.

**4.1.36 Mortgage Taxes**.    Borrower represents that it has caused Mortgage Borrower to pay all state, county and municipal recording and all other taxes imposed upon the execution and recordation of the Mortgage.

**Section 4.2    Survival of Representations**.    Borrower agrees that all of the representations and warranties of Borrower set forth in Section 4.1 and elsewhere in this Agreement and in the other Loan Documents shall survive for so long as any portion of the principal balance of the Loan remains owing to Lender under this Agreement or any of the other Loan Documents by Borrower. All representations, warranties, covenants and agreements made in this Agreement or in the other Loan Documents by Borrower shall be deemed to have been relied upon by Lender notwithstanding any investigation heretofore or hereafter made by Lender or on its behalf.

## V.    BORROWER COVENANTS

**Section 5.1    Affirmative Covenants**.    From the date hereof and until payment and performance in full of all obligations of Borrower under the Loan Documents or the earlier release of the Lien of the Pledge Agreement (and all related obligations) in accordance with the terms of this Agreement and the other Loan Documents, Borrower hereby covenants and agrees with Lender that:

**5.1.1    Existence; Compliance with Legal Requirements**.    Borrower shall, and shall cause Mortgage Borrower to, do or cause to be done all things necessary to preserve, renew and keep in full force and effect its existence, rights, licenses, permits and franchises and comply in all material respects with all Legal Requirements applicable to Borrower, Mortgage Borrower, the Collateral and the Property, including, without limitation, Prescribed Laws. There shall never be committed by Borrower and Borrower shall not permit Mortgage Borrower to permit any other Person in occupancy of or involved with the operation or use of the Property or the Collateral to commit any act or omission affording the federal government or any state or local government the right of forfeiture against the Collateral, the Property or any part thereof or any monies paid in performance of Borrower's obligations under any of the Loan Documents. Borrower hereby covenants and agrees not to commit, permit or suffer to exist any act or omission affording such right of forfeiture. Borrower shall, and shall cause Mortgage Borrower to, at all times use commercially reasonable efforts to maintain, preserve and protect all franchises and trade names and preserve all the remainder of its property used or useful in the conduct of its business and shall keep the Property in good working order and repair, and from time to time make, or cause to be made, all reasonably necessary repairs, renewals, replacements, betterments and improvements thereto, all as more fully provided in the Mortgage. Borrower shall, and shall cause Mortgage Borrower to, keep the Property insured at all times by financially sound and reputable insurers, to such extent and against such risks, and

maintain liability and such other insurance, as is more fully provided in this Agreement. After prior written notice to Lender, Borrower or Mortgage Borrower, at its own expense, may contest by appropriate legal proceeding promptly initiated and conducted in good faith and with due diligence, the validity of any Legal Requirement, the applicability of any Legal Requirement to Borrower, Mortgage Borrower, the Collateral or the Property or any alleged violation of any Legal Requirement, provided that (a) no Default or Event of Default has occurred and remains uncured; (b) Mortgage Borrower is permitted to do so under the Mortgage Loan Documents; (c) such proceeding shall be permitted under and be conducted in accordance with the provisions of any instrument to which Borrower or Mortgage Borrower is subject and shall not constitute a default thereunder and such proceeding shall be conducted in accordance with all applicable statutes, laws and ordinances; (d) neither the Property nor the Collateral nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, cancelled or lost; (e) Borrower shall, and shall cause Mortgage Borrower to, promptly upon final determination thereof comply with any such Legal Requirement determined to be valid or applicable or cure any violation of any Legal Requirement; (f) such proceeding shall suspend the enforcement of the contested Legal Requirement against Borrower, Mortgage Borrower, the Collateral or the Property or such Taxes or Other Charges have been paid in full; and (g) Borrower or Mortgage Borrower shall furnish such security as may be required in the proceeding, or as may be reasonably requested by Lender, to insure compliance with such Legal Requirement, together with all interest and penalties payable in connection therewith. Lender may apply any such security, as necessary to cause compliance with such Legal Requirement at any time when, in the reasonable judgment of Lender, the validity, applicability or violation of such Legal Requirement is finally established or the Property or the Collateral (or any part thereof or interest therein) shall be in danger of being sold, forfeited, terminated, cancelled or lost. If any asbestos or asbestos containing material is discovered at the Property, Borrower will promptly inform Lender thereof and Borrower shall promptly put in place an appropriate operations and maintenance plan.

**5.1.2  Taxes and Other Charges.**  Borrower shall, or shall cause Mortgage Borrower to, pay all Taxes and Other Charges now or hereafter levied or assessed or imposed against the Property or any part thereof as the same become delinquent; provided, however, that Borrower's obligation to directly pay Taxes shall be suspended for so long as Borrower complies with the relevant escrow terms and provisions of the Mortgage Loan Documents or Section 7.2 hereof, as applicable. Borrower will deliver or cause to be delivered to Lender receipts for payment or other evidence reasonably satisfactory to Lender that the Taxes and Other Charges have been so paid or are not then delinquent prior to the date on which the Taxes and/or Other Charges would otherwise be delinquent if not paid. Borrower shall furnish or cause to be furnished to Lender receipts for the payment of the Taxes and the Other Charges prior to the date the same shall become delinquent (provided, however, that Borrower is not required to furnish such receipts for payment of Taxes in the event that such Taxes have been paid by Lender pursuant to Section 7.2 hereof). Borrower shall not suffer and shall not permit Mortgage Borrower to suffer and shall promptly cause to be paid and discharged any Lien or charge whatsoever which may be or become a Lien or charge against the Property (other than Permitted Encumbrances), and shall cause Mortgage Borrower to promptly pay for all utility services provided to the Property. After prior written notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application in whole or in part of any Taxes or Other Charges, provided that (a) no Event of Default has occurred and remains

uncured; (b) Mortgage Borrower is permitted to do so under the provisions of the Mortgage Loan Documents; (c) such proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument to which Borrower or Mortgage Borrower is subject and shall not constitute a default thereunder and such proceeding shall be conducted in accordance with all applicable statutes, laws and ordinances; (d) neither the Property nor the Collateral nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, cancelled or lost; (e) Borrower shall, and shall cause Mortgage Borrower to, promptly upon final determination thereof pay the amount of any such Taxes or Other Charges, together with all costs, interest and penalties which may be payable in connection therewith; (f) such proceeding shall suspend the collection of such contested Taxes or Other Charges from the Property or such other Taxes or Other Charges shall have been paid in full; and (g) unless such security has been furnished to Mortgage Lender under the Mortgage Loan Agreement, Borrower or Mortgage Borrower shall furnish such security as may be required in the proceeding, or as may be requested by Lender (which security shall not exceed 125% of the amount being contested) (provided that no such security shall be required to the extent that the contested Taxes or Other Charges have been paid in full notwithstanding the protest), to insure the payment of any such unpaid Taxes or Other Charges, together with all interest and penalties thereon. Lender may pay over any such cash deposit or part thereof held by Lender to the claimant entitled thereto at any time when, in the judgment of Lender, the entitlement of such claimant is established or the Property or the Collateral (or any part thereof or interest therein) shall be in danger of being sold, forfeited, terminated, cancelled or lost or there shall be any danger of the Lien of the Mortgage or the Pledge Agreement being primed by any related Lien.

**5.1.3   Litigation.** Borrower shall give prompt written notice to Lender of any litigation or governmental proceedings pending or threatened against Borrower, Mortgage Borrower, Principal, or any Guarantor which might materially adversely affect Borrower's, Mortgage Borrower's, Principal's or Guarantor's condition (financial or otherwise) or business or the Property.

**5.1.4   Access to Property.** Borrower shall cause Mortgage Borrower to permit agents, representatives and employees of Lender to inspect the Property or any part thereof at reasonable hours upon reasonable advance notice, and subject to the rights of tenants under Leases.

**5.1.5   Notice of Default.** Borrower shall promptly advise Lender in writing of any material adverse change in Borrower's, Mortgage Borrower's, Principal's, or Guarantor's condition, financial or otherwise, or of the occurrence of any Default or Event of Default of which Borrower has knowledge.

**5.1.6   Cooperate in Legal Proceedings.** Borrower shall cooperate fully with Lender with respect to any proceedings before any court, board or other Governmental Authority which may in any way affect the rights of Lender hereunder or any rights obtained by Lender under any of the other Loan Documents and, in connection therewith, permit Lender, at its election, to participate in any such proceedings.

**5.1.7   Perform Loan Documents.** Borrower shall observe, perform and satisfy all of the terms, provisions, covenants and conditions of, and shall pay when due all costs,

fees and expenses to the extent required under the Loan Documents executed and delivered by, or applicable to, Borrower. Payment of the costs and expenses associated with any of the foregoing shall be in accordance with the terms and provisions of this Agreement, including, without limitation, the provisions of <u>Section 10.13</u> hereof.

**5.1.8   Award and Insurance Benefits**. Borrower shall, and shall cause Mortgage Borrower to, cooperate with Lender in obtaining for Lender the benefits of any Awards or Insurance Proceeds lawfully or equitably payable in connection with the Property, and Lender shall be reimbursed for any reasonable out-of-pocket expenses incurred in connection therewith (including reasonable attorneys' fees and disbursements, and the payment by Borrower of the reasonable expense of an appraisal on behalf of Lender in case of Casualty or Condemnation affecting the Property or any part thereof) out of such Insurance Proceeds.

**5.1.9   Further Assurances**. Borrower shall, and shall cause Mortgage Borrower to, at Borrower's and Mortgage Borrower's sole cost and expense:

(a)   furnish to Lender all instruments, documents, boundary surveys, footing or foundation surveys, certificates, plans and specifications, appraisals, title and other insurance reports and agreements, and each and every other document, certificate, agreement and instrument required to be furnished by Borrower pursuant to the terms of the Loan Documents or reasonably requested by Lender in connection therewith;

(b)   execute and deliver to Lender such documents, instruments, certificates, assignments and other writings, and do such other acts necessary or desirable, to evidence, preserve and/or protect the collateral at any time securing or intended to secure the obligations of Borrower under the Loan Documents, as Lender may reasonably require; and

(c)   do and execute all and such further lawful and reasonable acts, conveyances and assurances for the better and more effective carrying out of the intents and purposes of this Agreement and the other Loan Documents, as Lender shall reasonably require from time to time.

**5.1.10   Licenses and Certificates of Occupancy**. After the Closing Date, Borrower shall cause Mortgage Borrower to not permit any certificate of use or certificate of occupancy applicable to the Property to expire without the renewal thereof and shall cause Mortgage Borrower to diligently take all actions as may be necessary to obtain, maintain in effect and renew, as required, all Licenses necessary for the operation and occupancy of the Property for its Intended Use.

**5.1.11   Financial Reporting**.

(a)   Borrower will maintain a system of accounting in accordance with sound business practices to permit preparation of financial statements in conformity with GAAP and proper and accurate books, records and accounts reflecting all of the financial affairs of Borrower with respect to all items of income and expense in connection with the operation of the Property and the Collateral. During the continuance of an Event of Default, (i) Lender shall have the right at all times during normal business hours upon reasonable written notice to examine such books, records and accounts at the office of Borrower or any other Person maintaining such

books, records and accounts and to make such copies or extracts thereof as Lender shall reasonably desire, and (ii) Borrower shall pay any reasonable out-of-pocket costs and expenses incurred by Lender to examine Borrower's accounting records with respect to the Property or the Collateral, as Lender shall reasonably determine to be necessary or appropriate in the protection of Lender's interest.

(b)     Within ninety (90) days after the end of each calendar year, Borrower shall provide to Lender true and complete annual financial statements for (i) Borrower, (ii) Mortgage Borrower and (iii) the operation of the Property prepared in accordance with GAAP, which annual financial statements shall be audited by a certified public accountant firm acceptable to Lender. Such financial statements shall (a) be prepared by an independent certified public accounting firm reasonably satisfactory to Lender and (b) include a balance sheet as of the end of such year, and profit and loss statements for such year, with such detailed supporting schedules covering the operation of the Property as Lender shall reasonably require including a reconciliation to the monthly reports and statements delivered to Lender and include an itemized accounting of all Gross Income from Operations, Operating Expenses and Net Cash Flow for the Property. As soon as reasonably practicable (but in any event within forty-five (45) days after the end of each calendar quarter, Borrower shall provide to Lender a true and complete quarterly balance sheet, and operating statement for Borrower, Mortgage Borrower and the Property, certified by the chief financial officer (or similar position) of Borrower which quarterly statements shall be in form and substance acceptable to Lender. Such quarterly statements shall be compared to the prior year's quarter and year-to-date and to the then applicable Approved Budget. As soon as reasonably practicable (but in any event within ten (10) days) after the end of each month, Borrower shall provide to Lender a true and complete monthly operating statement for Borrower, Mortgage Borrower and the Property certified by the chief financial officer (or similar position) of Borrower. Such monthly statements shall also (a) state Gross Income from Operations, Operating Expenses and Net Cash Flow for the month most recently ended, (b) be in form and substance acceptable to Lender, and (c) include a comparison to the prior year's month and year-to-date and to the then applicable period. Borrower shall also provide such other financial information as Lender may, from time to time, reasonably request certified (if requested by Lender) by the applicable chief financial officer (or similar position). Borrower will deliver, concurrently with the annual and quarterly statements, a compliance certificate in the form of Schedule 5.1 to the Mortgage Loan Agreement certified by its chief financial officer (or analogous position). Additionally, within ten (10) days after the end of each calendar month, upon the opening of the Property to the public, Borrower shall deliver to Lender (i) a schedule of Bookings and Bookings Deposits and the application thereof. Each set of monthly financial statements shall be accompanied by statements of occupancy, ADR and REVPAR for the Property certified by Borrower's chief financial officer.

(c)     Together with each delivery of annual audited financial statements of Borrower if required pursuant to Section 5.11(b), Borrower will deliver a written statement by its independent certified public accountants (1) stating that the examination has included a review of the terms of this Agreement as such terms relate to accounting matters, (2) stating whether, in connection with the examination, any condition or event that constitutes a Default or an Event of Default under the Loan or the Mortgage Loan (of which said accountants may be aware from said audit, and without obligation to review other aspects of this Agreement, the Mortgage Loan Agreement or to audit any of the other Loan Documents or Mortgage Loan

Documents) has come to their attention, and (3) if such a condition or event has come to their attention, specifying the nature and period of existence thereof.

(d)     Promptly upon receipt thereof, Borrower will deliver to Lender copies of all significant reports submitted to Borrower or Mortgage Borrower by independent public accountants in connection with each annual, interim or special audit of the financial statements of Borrower or Mortgage Borrower made by such accountants, including the comment letter submitted by such accountants to management in connection with their annual audit.

(e)     Borrower will deliver to Lender copies of all federal income and other tax returns, schedules, statements and reports to its owners within thirty (30) days after the earlier of filing or delivery of such tax returns or other items with the Internal Revenue Service or the applicable Governmental Authority or delivery to its owners.

(f)     Borrower shall cause Mortgage Borrower to prepare and deliver to Lender prior to the beginning of each fiscal year of Mortgage Borrower, forecasts in form and substance reasonably satisfactory to Mortgage Lender for the following fiscal year (each, an "**Operating Budget**"), which have been approved by Mortgage Lender in accordance with the Mortgage Loan Agreement (as so approved, an "**Approved Budget**").

(g)     In the event that, Borrower or Mortgage Borrower must incur an extraordinary operating expense or capital expense not set forth in the Approved Budget (each an "**Extraordinary Expense**"), then Borrower shall promptly deliver to Lender a reasonably detailed explanation of such proposed Extraordinary Expense for Lender's approval, which approval shall not be unreasonably withheld.

(h)     With reasonable promptness, Borrower will deliver such other information and data with respect to Borrower or Mortgage Borrower as from time to time may be reasonably requested by Lender.

(i)     Any reports, statements or other information required to be delivered under this Agreement shall be delivered (i) in paper form, (ii) scanned PDF file, and (iii) if requested by Lender and within the reasonable capabilities of Borrower's data systems without change or modification thereto, in electronic form and prepared using a Microsoft Word for Windows or WordPerfect for Windows files or Microsoft Excel (which files may be prepared using a spreadsheet program and saved as word processing files).

**5.1.12 Business and Operations**.     Borrower will, and will cause Mortgage Borrower to, continue to engage in the businesses presently conducted by it as and to the extent the same are necessary for the ownership, maintenance, management and operation of the Collateral and the Property, as applicable.  Borrower will, and will cause Mortgage Borrower to, qualify to do business and will remain in good standing under the laws of each jurisdiction as and to the extent the same are required for the ownership, maintenance, management and operation of the Property and the Collateral, as applicable.

**5.1.13 Title to Collateral and the Property**.  Borrower will warrant and defend title to the Collateral, subject only to Liens permitted hereunder (including Permitted

Encumbrances) against the claims of all Persons whomsoever. Borrower will cause Mortgage Borrower to warrant and defend (a) the title to the Property and every part thereof, subject only to Liens permitted hereunder (including Permitted Encumbrances) and (b) the validity and priority of the Lien of the Mortgage, subject only to Liens permitted under the Mortgage Loan Documents, in each case against the claims of all Persons whomsoever. Borrower shall reimburse Lender for any losses, damages or reasonable out-of-pocket costs or expenses (including reasonable attorneys' fees and court costs) incurred by Lender if an interest in the Collateral is claimed by another Person.

**5.1.14 <u>Costs of Enforcement</u>**. In the event (a) that the Mortgage is foreclosed in whole or in part or that the Mortgage is put into the hands of an attorney for collection, suit, action or foreclosure, (b) of the foreclosure of any mortgage prior to or subsequent to the Mortgage in which proceeding Lender is made a party, or (c) that the Pledge Agreement is foreclosed in whole or in part or that the Note is put into the hands of an attorney for collection, suit, action or foreclosure, or (d) of the bankruptcy, insolvency, rehabilitation or other similar proceeding in respect of Borrower, Mortgage Borrower or any of their respective constituent Persons or an assignment by Borrower, Mortgage Borrower or any of their respective constituent Persons for the benefit of its creditors, Borrower, its successors or assigns, shall be chargeable with and agrees to pay all out-of-pocket and reasonable costs of collection and defense, including reasonable attorneys' fees and reasonable out-of-pocket costs, incurred by Lender or Borrower in connection therewith and in connection with any appellate proceeding or post-judgment action involved therein, together with all required service or use taxes.

**5.1.15 <u>Estoppel Statements</u>**. After request by Lender, Borrower shall within ten (10) Business Days furnish Lender with a statement, duly acknowledged and certified, setting forth (i) the amount of the original principal amount of the Note, (ii) the unpaid principal amount of the Note, (iii) the Interest Rate of the Note, (iv) the date installments of interest and/or principal were last paid, (v) any offsets or defenses to the payment of the Debt, if any, (vi) that the Note, this Agreement, the Pledge Agreement and the other Loan Documents have not been modified or if modified, giving particulars of such modification, (vii) that the Management Agreement is in full force and effect and has not been modified (or if modified, setting forth all modifications), (viii) the date to which management fees have been paid pursuant to the Management Agreement and (ix) whether or not Manager is in default under the Management Agreement and, if Manager is in default, setting forth the specific nature of all of such defaults.

**5.1.16 <u>Loan Proceeds</u>**. Borrower shall use the proceeds of the Loan received by it on the Closing Date only for the purposes set forth in <u>Section 2.1.4</u>.

**5.1.17 <u>Performance by Borrower</u>**. Borrower shall in a timely manner observe, perform and fulfill each and every covenant, term and provision of each Loan Document executed and delivered by, or applicable to, Borrower, and shall not enter into or otherwise suffer or permit any amendment, waiver, supplement, termination or other modification of any Loan Document executed and delivered by, or applicable to, Borrower without the prior written consent of Lender.

**5.1.18 <u>Intentionally Omitted</u>**.

**5.1.19 No Joint Assessment**.    Borrower shall not permit Mortgage Borrower to suffer, permit or initiate the joint assessment of the Property (a) with any other real property constituting a tax parcel separate from the Property, and (b) which constitutes real property with any portion of the Property which may be deemed to constitute personal property, or any other procedure whereby the lien of any taxes which may be levied against such personal property shall be assessed or levied or charged to such real property portion of the Property.

**5.1.20 Leasing Matters**.    Borrower shall not hereafter cause or permit Mortgage Borrower to enter into any material Lease or other rental or occupancy arrangement or concession agreement with respect to the Property or any portion thereof without Lender's consent, which shall not be unreasonably withheld. Borrower shall not cause or permit Mortgage Borrower to modify, amend or terminate any Leases, give any material consents, waive any material obligations under any Leases or release any tenant or guarantor of any Leases, without, in each instance, Lender's consent, which shall not be unreasonably withheld. In no event will Borrower cause or permit Mortgage Borrower to enter into any Capital Leases. All Leases executed after the date hereof shall provide that they are subordinate to the Mortgage and that the tenant agrees to attorn to Mortgage Lender or any purchaser at a sale by foreclosure or power of sale.

**5.1.21 Alterations**.    Borrower shall cause Mortgage Borrower to comply with the terms and provisions of Section 7.14 of the Mortgage Loan Agreement. All notices to, approvals from, and consents of Lender required under Section 7.14 of the Mortgage Loan Agreement shall also apply to and be required of Lender under this Agreement.

**5.1.22 Operation of the Property**.

(a)    Borrower shall cause Mortgage Borrower to cause the Property to be operated, in all material respects, in accordance with the Management Agreement (or Replacement Management Agreement as applicable).    In the event that the Management Agreement expires or is terminated (without limiting any obligation of Borrower or Mortgage Borrower to obtain Lender's consent to any termination or modification of the Management Agreement in accordance with the terms and provisions of this Agreement and the Mortgage Loan Agreement), Borrower shall cause Mortgage Borrower to promptly enter into a Replacement Management Agreement with Manager or another Qualified Manager, as applicable.

(b)    Borrower shall cause Mortgage Borrower to: (i) promptly perform and/or observe, in all material respects, all of the covenants and agreements required to be performed and observed by Mortgage Borrower under the Management Agreement and do all things necessary to preserve and to keep unimpaired its material rights thereunder; (ii) promptly notify Lender of any material default under the Management Agreement of which it is aware which would give rise to a right of termination; (iii) promptly deliver to Lender a copy of each financial statement, business plan, and Capital Expenditures plan received by Mortgage Borrower under the Management Agreement; and (iv) enforce the performance and observance of all of the material covenants and agreements required to be performed and/or observed by Manager under the Management Agreement, in a commercially reasonable manner.

**5.1.23 Intentionally Omitted.**

**5.1.24 No Other Debt.**

(a)    No secondary financing or encumbrance, or secured or unsecured indebtedness of any kind shall be permitted without Lender's prior written consent, other than (i) the Loan and (ii) unsecured trade and operational debt incurred in the ordinary course of business relating to the ownership and operation of the Collateral and the routine administration of Borrower, in amounts not to exceed two percent (2%) of the original principal balance of the Loan at any one time, which liabilities are not more than ninety (90) days past the date incurred with trade and operational creditors, are not evidenced by a note and are paid when due, and which amounts are normal and reasonable under the circumstances.

**5.1.25 Reserve Accounts.**    Borrower shall cause Mortgage Borrower to deposit and maintain each of the Reserve Accounts (as defined in the Mortgage Loan Agreement) as more particularly set forth in the Mortgage Loan Agreement and to perform and comply with all the terms and provisions relating thereto.

**5.1.26 Special Distributions.**    On each date on which amounts are required to be paid to Lender under any of the Loan Documents, to the extent permitted by the Mortgage Loan Documents and the Intercreditor Agreement, Borrower shall exercise its rights under Mortgage Borrower's limited liability company agreement to cause Mortgage Borrower to make to Borrower a distribution in an aggregate amount such that Lender shall receive the amount required to be paid to Lender on such date.

**5.1.27 Curing.**    Lender shall have the right, but shall not have the obligation, to exercise Borrower's rights under Mortgage Borrower's limited liability company agreement: (a) to cure a Mortgage Loan Default or Mortgage Loan Event of Default and (b) to satisfy any Liens, claims or judgments against any part of the Property (except for Liens permitted by the Mortgage Loan Documents), in each case, unless Borrower or Mortgage Borrower shall be diligently pursuing remedies to cure to Lender's satisfaction. Borrower shall reimburse Lender on demand for any and all costs incurred by Lender in connection with curing any such Mortgage Loan Default or Mortgage Loan Event of Default or satisfying any Liens, claims or judgments against any of the Property.

**Section 5.2    Negative Covenants.**    From the date hereof until payment and performance in full of all obligations of Borrower under the Loan Documents or the earlier release of the Lien of the Pledge Agreement in accordance with the terms of this Agreement and the other Loan Documents, Borrower covenants and agrees with Lender that it will not do, directly or indirectly, any of the following:

**5.2.1 Operation of the Property.**

(a)    Borrower shall not cause or permit Mortgage Borrower to, without Lender's prior written consent (which consent shall not be unreasonably withheld, conditioned or delayed):  (i) surrender, terminate or cancel the Management Agreement; provided, that Borrower may cause Mortgage Borrower to, without Lender's consent, terminate the Management Agreement and replace the Manager so long as the replacement manager is a

Qualified Manager pursuant to a Replacement Management Agreement acceptable to Lender in all respects; (ii) reduce or consent to the reduction of the term of the Management Agreement; (iii) increase or consent to the increase of the amount of any charges under the Management Agreement; or (iv) otherwise modify, change, supplement, alter or amend, or waive or release any of its rights and remedies under, the Management Agreement in any material respect.

(b)    During the continuance of an Event of Default, Borrower shall not, and shall not permit Mortgage Borrower to, exercise any rights, make any decisions, grant any approvals or otherwise take any action under the Management Agreement without the prior written consent of Lender, which consent may be granted, conditioned or withheld in Lender's sole discretion.

**5.2.2    Liens**.  Borrower shall not create, incur, assume or suffer to exist any Lien on the Collateral or permit any such action to be taken.  Borrower shall not cause or permit Mortgage Borrower to create, incur, assume or suffer to exist any Lien on any portion of the Property or permit any such action to be taken, except:

(i)    Permitted Encumbrances;

(ii)    Liens created by or permitted pursuant to the Loan Documents; and

(iii)    Liens for Taxes or Other Charges not yet due.

**5.2.3    Dissolution**.  Borrower shall not, and shall not allow Mortgage Borrower to, (a) engage in any dissolution, liquidation or consolidation or merger with or into any other business entity, (b) engage in any business activity not related to the ownership and operation of the Property or the Collateral, as applicable, (c) transfer, lease or sell, in one transaction or any combination of transactions, the assets or all or substantially all of the properties or assets of Borrower or Mortgage Borrower except to the extent permitted by the Loan Documents and the Mortgage Loan Documents, (d) modify, amend, waive or terminate its organizational documents or its qualification and good standing in any jurisdiction, (e) modify, amend or waive its organizational documents in any way that would impair its status as a Special Purpose Entity or (f) cause the Principal to (i) dissolve, wind up or liquidate or take any action, or omit to take an action, as a result of which the Principal would be dissolved, wound up or liquidated in whole or in part, or (ii) amend, modify, waive or terminate organizational documents of the Principal without obtaining the prior written consent of Lender.

**5.2.4    Change In Business**.  Borrower shall not enter into any line of business other than the ownership and operation of the Property, or make any material change in the scope or nature of its business objectives, purposes or operations, or undertake or participate in activities other than the continuance of its present business.  In addition, Borrower shall not permit or cause Mortgage Borrower to cancel or otherwise forgive or release any material claim or debt (other than termination of Leases in accordance herewith) owed to Mortgage Borrower by any Person, except for adequate consideration and in the ordinary course of its business.

**5.2.5    Debt Cancellation**.  Borrower shall not, and shall not allow Mortgage Borrower to, cancel or otherwise forgive or release any claim or debt (other than

termination of Leases in accordance herewith) owed to Borrower or Mortgage Borrower by any Person, except for adequate consideration and in the ordinary course of Borrower's or Mortgage Borrower's business.

**5.2.6    Zoning.**    Borrower shall not, and shall not allow Mortgage Borrower to, initiate or consent to any zoning reclassification of any portion of the Property or seek any variance under any existing zoning ordinance or use or permit the use of any portion of the Property in any manner that could result in such use becoming a non-conforming use under any zoning ordinance or any other applicable land use law, rule or regulation, without the prior consent of Lender.

**5.2.7    Intentionally Omitted.**

**5.2.8    Principal Place of Business and Organization.**    Borrower shall not change or permit Mortgage Borrower to change its principal place of business set forth in the introductory paragraph of this Agreement without first giving Lender at least fifteen (15) days prior written notice. Borrower shall not change the place of its organization as set forth in Section 4.1.28 without the consent of Lender, which consent shall not be unreasonably withheld, conditioned or delayed. Upon Lender's request, Borrower shall execute and deliver additional financing statements, security agreements and other instruments which may be necessary to effectively evidence or perfect Lender's security interest in the Property as a result of such change of principal place of business or place of organization. Borrower's principal place of business and chief executive office, and the place where Borrower keeps its books and records, including recorded data of any kind or nature, regardless of the medium or recording, including software, writings, plans, specifications and schematics, has been for the preceding four months (or, if less, the entire period of the existence of Borrower) and will continue to be the address of Borrower set forth at the introductory paragraph of this Agreement (unless Borrower notifies Lender in writing at least fifteen (15) days prior to the date of such change).

**5.2.9    ERISA.**

(a)    Borrower shall not, and shall not allow Mortgage Borrower to, engage in any transaction which would cause any obligation, or action taken or to be taken, hereunder (or the exercise by Lender of any of its rights under the Note, this Agreement or the other Loan Documents) to be a non-exempt (under a statutory or administrative class exemption) prohibited transaction under ERISA.

(b)    Borrower further covenants and agrees to deliver to Lender such certifications or other evidence from time to time throughout the term of the Loan, as requested by Lender in its sole discretion, that (A) Borrower is not and does not maintain an "employee benefit plan" as defined in Section 3(3) of ERISA, which is subject to Title I of ERISA, or a "governmental plan" within the meaning of Section 3(3) of ERISA; (B) Borrower is not subject to state statutes regulating investments and fiduciary obligations with respect to governmental plans; and (C) one or more of the following circumstances is true:

(i)    Equity interests in Borrower are publicly offered securities, within the meaning of 29 C.F.R. §2510.3-101(b)(2);

(ii)     Less than twenty-five percent (25%) of each outstanding class of equity interests in Borrower are held by "benefit plan investors" within the meaning of 29 C.F.R. §2510.3-101(f)(2); or

(iii)     Borrower qualifies as an "operating company" or a "real estate operating company" within the meaning of 29 C.F.R. §2510.3-101(c) or (e).

### 5.2.10 <u>Transfers</u>.

(a)     Borrower acknowledges that Lender has examined and relied on the experience of Borrower and its stockholders, general partners, members, principals and (if Borrower is a trust) beneficial owners in owning the Collateral and operating properties such as the Property in agreeing to make the Loan, and will continue to rely on Borrower's ownership of the Collateral and Mortgage Borrower's ownership of the Property as a means of maintaining the value of the Collateral as security for repayment of the Debt and the performance of the other obligations under the Loan Documents.  Borrower acknowledges that Lender has a valid interest in maintaining the value of the Collateral so as to ensure that, should Borrower default in the repayment of the Debt or the performance of such other obligations, contained in the Loan Documents, Lender can recover the Debt by a sale of the Collateral.

(b)     Unless Lender's consent is not required pursuant to the Intercreditor Agreement, without the prior written consent of Lender and except to the extent otherwise set forth in this <u>Section 5.2.10</u>, Borrower shall not, and shall not permit any Restricted Party to, (i) sell, convey, mortgage, grant, bargain, encumber, pledge, assign, grant options with respect to, or otherwise transfer or dispose of (directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration or of record) the Property, the Collateral or any part thereof or any legal or beneficial interest therein or (ii) permit a Sale or Pledge of an interest in any Restricted Party (collectively, a **"Transfer"**), other than pursuant to Leases of space in the Improvements to tenants in accordance with the provisions of <u>Section 5.1.20</u>.

(c)     A Transfer shall include, but not be limited to, (i) an installment sales agreement wherein Borrower agrees to sell the Collateral or any part thereof or Mortgage Borrower agrees to sell the Property or any part thereof, in each case, for a price to be paid in installments; (ii) an agreement by Mortgage Borrower leasing all or a substantial part of the Property for other than actual occupancy by a space tenant thereunder or a sale, assignment or other transfer of, or the grant of a security interest in, Mortgage Borrower's right, title and interest in and to any Leases or any Rents; (iii) if a Restricted Party is a corporation, any merger, consolidation or Sale or Pledge of such corporation's stock or the creation or issuance of new stock; (iv) if a Restricted Party is a limited or general partnership or joint venture, any merger or consolidation or the change, removal, resignation or addition of a general partner or the Sale or Pledge of the partnership interest of any general partner or any profits or proceeds relating to such partnership interest, or the Sale or Pledge of limited partnership interests or any profits or proceeds relating to such limited partnership interest or the creation or issuance of new limited partnership interests; (v) if a Restricted Party is a limited liability company, any merger or consolidation or the change, removal, resignation or addition of a managing member or

non-member manager (or if no managing member, any member) or the Sale or Pledge of the membership interest of a managing member (or if no managing member, any member) or any profits or proceeds relating to such membership interest, or the Sale or Pledge of non-managing membership interests or the creation or issuance of new non-managing membership interests; (vi) if a Restricted Party is a trust or nominee trust, any merger, consolidation or the Sale or Pledge of the legal or beneficial interest in a Restricted Party or the creation or issuance of new legal or beneficial interests; or (vii) the removal or the resignation of the managing agent (including, without limitation, an Affiliated Manager) other than in accordance with Section 5.1.22 hereof.

(d)　　　Notwithstanding the provisions of this Section 5.2.10, the following transfers shall not be deemed to be a Transfer and Lender's consent to the following transfers shall not be required: (i) gifts for estate planning purposes of any individual's interests in Borrower or in Borrower's partners or members to the spouse or any lineal descendant of such individual, or to a trust for the benefit of any one or more of such individual, spouse or lineal descendant so long as Borrower is reconstituted, if required, following such gift and so long as those Persons responsible for the day to day management of the Property remain unchanged following such gift or any replacement management is approved by Lender or (ii) a Transfer that is not a Change in Control, in each case if Lender has given its prior written consent (which consent shall not be unreasonably withheld), and no Change in Control occurs by virtue of such Transfers.  Notwithstanding anything to the contrary in this Section 5.2.10(d) or in any other Loan Document or Mortgage Loan Document, in no event shall any transfers of any direct ownership interests in Mortgage Borrower be permitted without the prior written consent of Lender.

**5.2.11  Deed in Lieu of Foreclosure**.  Unless Lender's consent is not required pursuant to the Intercreditor Agreement, without the express prior written consent of Lender, Borrower shall not, and Borrower shall not cause, suffer or permit Mortgage Borrower to, enter into any deed or assignment in lieu of foreclosure or other consensual foreclosure with or for the benefit of Mortgage Lender or any of its Affiliates.  Without the express prior written consent of Lender, Borrower shall not, and Borrower shall not cause, suffer or permit Mortgage Borrower to, enter into any consensual sale or other transaction in connection with the Mortgage Loan which could diminish, modify, terminate, impair or otherwise adversely affect the interests of Lender or Borrower, the Collateral or any portion thereof or any interest therein or of Mortgage Borrower in the Property or any portion thereof or any interest therein.

**5.2.12  Acquisition of Mortgage Loan**.  Neither Borrower, Guarantor nor any Affiliate of any of them shall acquire or agree to acquire the Mortgage Loan, or any portion thereof or any interest therein, or any direct or indirect ownership interest in the holder of the Mortgage Loan, via purchase, transfer, exchange or otherwise, and any breach or attempted breach of this provision shall constitute an Event of Default hereunder. If, solely by operation of applicable subrogation law, Borrower, Guarantor or any Affiliate of any of them shall have failed to comply with the foregoing, then Borrower:  (i) shall immediately notify Lender of such failure; (ii) shall cause any and all such prohibited parties acquiring any interest in the Mortgage Loan Documents:  (A) not to enforce the Mortgage Loan Documents; and (B) upon the request of Lender, to the extent any of such prohibited parties has or have the power or authority to do so, to promptly:  (1) cancel the promissory note evidencing the Mortgage Loan, (2) reconvey and

release the lien securing the Mortgage Loan and any other collateral under the Mortgage Loan Documents, and (3) discontinue and terminate any enforcement proceeding(s) under the Mortgage Loan Documents.

**5.2.13** **Limitations on Distributions.**  Following the occurrence and during the continuance of an Event of Default beyond any applicable cure periods, Borrower shall not make any distributions to its partners or members, nor shall Borrower cause Mortgage Borrower to make any distributions.

**5.2.14** **Other Limitations**.  Prior to the payment in full of the Debt, Borrower shall not and shall not permit any of its Affiliates to, without the prior written consent of Lender (which may be furnished or withheld at its sole and absolute discretion), give its consent or approval to any of the following actions or items:

(a)    except as permitted by Lender herein, unless Lender's consent is not required pursuant to the Intercreditor Agreement, (i) any refinance of the Mortgage Loan or the Loan, (ii) any prepayment in full of the Mortgage Loan or the Loan, or (iii) except as expressly permitted herein and in the Mortgage Loan Documents, any Transfer of the Property or the Collateral or any portion thereof;

(b)    creating, incurring, assuming or suffering to exist any additional Liens on any portion of the Property or the Collateral, except for Permitted Encumbrances;

(c)    any modification, amendment, consolidation, spread, restatement, waiver or termination of any of the Mortgage Loan Documents (if Lender's consent is required under the Intercreditor Agreement) or Loan Documents;

(d)    the distribution to the partners, members or shareholders of Borrower or Mortgage Borrower of property other than cash;

(e)    except as set forth in an Approved Budget and as permitted under the Mortgage Loan Documents, any (i) improvement, renovation or refurbishment of all or any part of the Property to a materially higher standard or level than that of comparable properties in the same market segment and in the same geographical area as the Property, (ii) removal, demolition or material alteration of the improvements or equipment on the Property or (iii) material increase in the square footage or gross leasable area of the Improvements on the Property if a material portion of any of the expenses in connection therewith are paid or incurred by Mortgage Borrower;

(f)    any material change in the method of conduct of the business of Borrower, Mortgage Borrower or any of their respective Affiliates;

(g)    the settlement of any claim against Borrower or any of its Affiliates, other than a fully-insured third party claim, in an amount greater than $50,000 (in the case of Borrower) or $100,000 (in the case of Mortgage Borrower); or

(h)    except as required by the Mortgage Loan Documents, any determination to restore the Property after a Casualty or Condemnation.

10728081.5                                                    - 43 -

**5.2.15 Intercreditor Agreement.** Borrower hereby acknowledges and agrees that any intercreditor agreement entered into between Lender and Mortgage Lender, including, without limitation, the Intercreditor Agreement, will be solely for the benefit of Lender and Mortgage Lender, as the case may be, and neither Borrower nor Mortgage Borrower (a) shall be intended third-party beneficiaries of any of the provisions therein, (b) shall have any rights thereunder and (c) shall be entitled to rely on any of the provisions contained therein. Lender and Mortgage Lender shall have no obligation to disclose to Borrower the contents of any intercreditor agreement, including, without limitation, the Intercreditor Agreement. Borrower's obligations hereunder are and will be independent of any such intercreditor agreement and shall remain unmodified by the terms and provisions thereof.

**5.2.16 Refinancing.** Borrower shall not consent to or permit a refinancing of the Mortgage Loan (in whole or in part) unless it obtains the prior written consent of Lender, unless Lender's consent is not required pursuant to the Intercreditor Agreement or unless the Loan shall be paid off in full in connection with such refinancing and in accordance with this Agreement.

## VI.    INSURANCE; CASUALTY; CONDEMNATION

### Section 6.1    Insurance.

(a)    Borrower shall cause Lender to be named as an additional insured under each of the Policies described on Schedule 5.4 of the Mortgage Loan Agreement. Borrower shall also cause all insurance described on Schedule 5.4 of the Mortgage Loan Agreement to provide for at least thirty (30) days prior notice to Lender in the event of policy cancellation or material changes. Borrower shall provide Lender with evidence of all such insurance required hereunder simultaneously with Mortgage Borrower's providing of such evidence to Mortgage Lender. Borrower shall cause Mortgage Borrower to obtain and maintain, or cause to be maintained, insurance for Borrower and the Property in accordance with the terms of the Mortgage Loan Agreement.

(b)    All insurance provided for in Section 6.1(a) shall be obtained under valid and enforceable policies (collectively, the "**Policies**" or in the singular, the "**Policy**"), and shall be subject to the approval of Lender as to insurance companies, amounts, deductibles, loss payees and insureds. The Policies shall be issued by financially sound and responsible insurance companies authorized to do business in the State of New York. The Policies described in this Section 6.1 (other than those strictly limited to liability protection) shall designate Lender as mortgagee and loss payee. Not less than five (5) days prior to the expiration dates of the Policies theretofore furnished to Lender, certificates of insurance evidencing the Policies accompanied by evidence satisfactory to Lender of payment of the premiums due thereunder (the "**Insurance Premiums**"), shall be delivered by Borrower to Lender.

(c)    Any blanket insurance Policy shall specifically allocate to the Property the amount of coverage from time to time required hereunder and shall otherwise provide the same protection as would a separate Policy insuring only the Property in compliance with the provisions of Section 6.1(a).

(d)    All Policies provided for or contemplated by <u>Section 6.1(a)</u> shall name Borrower as an insured and Lender as an additional insured, as its interests may appear, and in the case of property damage, boiler and machinery, flood and earthquake insurance, shall contain a so-called New York standard non-contributing mortgagee clause in favor of Lender providing that the loss thereunder shall be payable to Lender.

(e)    If at any time Lender is not in receipt of written evidence that all insurance required hereunder is in full force and effect, Lender shall have the right, without notice to Borrower, to take such action as Lender deems necessary to protect its interest in the Collateral and the Property, including, without limitation, the obtaining of such insurance coverage as Lender in its sole discretion deems appropriate. All premiums incurred by Lender in connection with such action or in obtaining such insurance and keeping it in effect shall be paid by Borrower to Lender upon demand and, until paid, shall be secured by the Collateral and shall bear interest at the Default Rate.

**Section 6.2    Casualty**. If the Property shall be damaged or destroyed, in whole or in part, by fire or other casualty (a "**Casualty**"), Borrower shall give prompt notice of such damage to Lender and shall cause Mortgage Borrower to promptly commence and diligently prosecute the completion of the Restoration of the Property as nearly as possible to the condition the Property was in immediately prior to such Casualty, with such alterations as may be reasonably approved by Lender and otherwise in accordance with Section 8 of the Mortgage Loan Agreement. Borrower shall cause Mortgage Borrower to pay all costs of such Restoration whether or not such costs are covered by insurance. Subject to the rights of Mortgage Lender, Lender may, but shall not be obligated, to make proof of loss if not made promptly by Borrower. In addition, Lender may participate in any settlement discussions with any insurance companies (and shall approve any final settlement, which approval shall not be unreasonably withheld) with respect to any Casualty in which the Net Proceeds or the costs of completing the Restoration are equal to or greater than Two Hundred Fifty Thousand and No/100 Dollars ($250,000.00) and Borrower shall deliver to Lender all instruments required by Lender to permit such participation. Borrower shall cause Mortgage Borrower to pay all costs of such Restoration whether or not such costs are covered by insurance.

**Section 6.3    Condemnation**. Borrower shall promptly give Lender notice of the actual or threatened commencement of any proceeding for the Condemnation of the Property and shall cause Mortgage Borrower to deliver to Lender copies of any and all papers served in connection with such proceedings. Lender may participate in any such proceedings if in excess of $250,000, and Borrower shall from time to time deliver to Lender all instruments requested by it to permit such participation. Borrower shall, at its expense, or shall cause Mortgage Borrower to, diligently prosecute any such proceedings, and shall consult with Lender, its attorneys and experts, and cooperate with them in the carrying on or defense of any such proceedings. Furthermore, Borrower shall cause Mortgage Borrower to cooperate with Lender in obtaining for Lender the benefits of any Awards lawfully or equitably payable in connection with the Property to the extent Lender is entitled to same under the terms of this Agreement. Notwithstanding any taking by any public or quasi-public authority through Condemnation or otherwise (including, but not limited to, any transfer made in lieu of or in anticipation of the exercise of such taking), Borrower shall continue to pay the Debt at the time and in the manner provided for its payment in the Note and in this Agreement and the Debt shall not be reduced until any Award shall have

10728081.5

been actually received and applied by Lender, after the deduction of expenses of collection, to the reduction or discharge of the Debt. Lender shall not be limited to the interest paid on the Award by the condemning authority but shall be entitled to receive out of the Award interest at the rate or rates provided herein or in the Note. If the Property or any portion thereof is taken by a condemning authority, Borrower shall cause Mortgage Borrower to promptly commence and diligently prosecute the Restoration of the Property and otherwise comply with the provisions of Section 8 of the Mortgage Loan Agreement. If the Property is sold, through foreclosure or otherwise, prior to the receipt by Lender of the Award, Lender shall have the right, whether or not a deficiency judgment on the Note shall have been sought, recovered or denied, to receive the Award, or a portion thereof sufficient to pay the Debt.

Section 6.4    Restoration.  Borrower shall, or shall cause Mortgage Borrower to, deliver to Lender all reports, plans, specifications, documents and other materials that are delivered to Mortgage Lender under Section 8 of the Mortgage Loan Agreement in connection with the Restoration of the Property.

Section 6.5    Casualty and Condemnation Proceeds. If, pursuant to the terms of the Mortgage Loan Documents, Mortgage Borrower is ever entitled to receive any portion of any Net Proceeds (i.e., such amounts are not required to be used for Restoration or to be applied to repayment of the Mortgage Loan), Borrower shall cause such portion of such Net Proceeds to be paid to Lender and all such amounts shall then be applied to the payment of the Debt in accordance with Section 2.4.4.

## VII.    RESERVE FUNDS

Section 7.1    Interest Reserve.

7.1.1    Deposit.  On the Closing Date, Borrower shall deposit with Lender the amount of $1,100,000 into a reserve account established by Lender to hold such funds (the "**Interest Reserve Account**") for the purpose of establishing a reserve fund in an amount to pay the interest portion of all Debt Service that will be due and payable by Borrower under this Agreement and the Note for the period from the Closing Date through the time that such amount is exhausted. Amounts deposited from time to time in the Interest Reserve Account pursuant to this Section 7.1 or otherwise are referred to herein as the "**Interest Reserve Funds**" and shall be disbursed to fund the interest portion of the Monthly Payment from time to time in accordance with Section 7.1.2 hereof.

7.1.2    Release of Interest Reserve Funds.  (a) So long as no Event of Default shall have occurred and be continuing, from and after the time that the Mezzanine Debt Service Advances have been advanced in full, and continuing thereafter through and including the Maturity Date (or such earlier time as the Interest Reserve Funds are exhausted), Lender shall, without the necessity of notifying Borrower, disburse a portion of the Interest Reserve Funds on each Payment Date in an amount equal to the Monthly Payment then due and payable on such Payment Date, and the same shall be applied pursuant to the terms of this Agreement. Notwithstanding the foregoing or anything to the contrary in the this Agreement, if any Monthly Payment scheduled to be made from Mezzanine Debt Service Advances is not made when due,

or is insufficient in any respect, Lender may disburse such Monthly Payment or insufficiency from the Interest Reserve Funds and apply such payment pursuant to the terms of this Agreement.

(b)     Borrower agrees and acknowledges that neither the insufficiency of the amount of, nor the unavailability of, the Interest Reserve Funds is intended to, and shall therefore not, constitute a limitation on the obligation of Borrower to pay the Debt Service under this Agreement.

## Section 7.2    Tax and Insurance Escrow Fund.

7.2.1    Provided Borrower is not relieved of its obligation to establish such Reserve Funds pursuant to Section 7.2.2, Borrower shall deposit (or cause to be deposited) with Lender (or such agent of Lender as Lender may designate in writing to Borrower from time to time), monthly, on the first day of each calendar month, 1/12th of (i) the annual charges (as estimated by Lender) for all Taxes relating to the Property as a reserve ("**Tax Reserve Fund**") for the payment of Taxes and (ii) if requested by Lender at its option, the annual Insurance Premiums with respect to the insurance required pursuant to Section 6.1 as a reserve ("**Insurance Reserve Fund**") for the payment of such Insurance Premiums.  Borrower shall also deposit (to be held as part of the applicable Reserve) with Lender, simultaneously with such monthly deposits and/or on the Closing Date, a sum of money which, together with such monthly deposits, will be sufficient to make the payment of each such charge or premium at least thirty (30) days prior to the date when due.  Should such charges or premiums not be ascertainable at the time any deposit is required to be made, the deposit shall be made on the basis of Lender's estimate.  When the charges or premiums are fixed for the then current year or period, Borrower shall deposit with Lender any deficiency within fifteen (15) days following Lender's demand. Borrower shall provide Lender with bills and all other documents necessary for the payment of the foregoing charges at least ten (10) days prior to the date on which each payment thereof shall first become delinquent.  So long as (i) no Event of Default exists, (ii) Borrower has provided Lender with the foregoing bills and other documents in a timely manner, and (iii) sufficient funds are held in the applicable Reserve by Lender for the payment of the Taxes and Insurance Premiums relating to the Property, as applicable, Lender shall, in its sole discretion either pay said items directly or allow such funds to be used by Borrower to pay said items.  All refunds of Taxes and, if an Insurance Reserve Fund is then required, Insurance Premiums shall be deposited into the applicable of the Tax Reserve Fund and/or the Insurance Reserve Fund.  Nothing herein shall limit Lender's option (but not obligation) to make to pay such Taxes or Insurance Premiums during the continuance of a Default or Event of Default.

7.2.2    **Waiver of Tax and Insurance Escrow.**    Borrower shall be relieved of its obligation to make deposits to the Tax Reserve Fund and/or Insurance Reserve Fund under Section 7.2.1 above, provided that (a) Mortgage Borrower is required to and does make monthly deposits to a tax and insurance escrow account under the Mortgage Loan Agreement, and (b) Lender receives evidence reasonably acceptable to it of the making of such deposits and of the payment of all such Taxes and Insurance Premiums.

## Section 7.3    Intentionally Omitted.

## Section 7.4    Reserve Funds Generally.

**7.4.1**    Borrower grants to Lender a first-priority perfected security interest in each of the Reserve Funds and any and all monies now or hereafter deposited in each Reserve Fund as additional security for payment of the Debt.    Until expended or applied in accordance herewith, the Reserve Funds shall constitute additional security for the Debt.

**7.4.2**    Upon the occurrence of an Event of Default, Lender may, in addition to any and all other rights and remedies available to Lender, apply any sums then present in any or all of the Reserve Funds to the payment of the Debt in any order in its sole discretion.

**7.4.3**    The Reserve Funds shall not constitute trust funds and may be commingled with other monies held by Lender.

**7.4.4**    The Reserve Funds shall be held in an account and shall bear interest at a rate selected by Lender.    All interest on a Reserve Fund shall be added to and become a part of such Reserve Fund and shall be disbursed in the same manner as other monies deposited in such Reserve Fund, except that interest on the Tax and Insurance Reserve Funds shall not be added to or become a part thereof and shall be the sole property of and shall be paid to Lender.    Borrower shall be responsible for payment of any federal, state or local income or other tax applicable to the interest earned on the Reserve Funds (with the exception of the Tax and Insurance Reserve Funds).

**7.4.5**    Borrower shall not, without obtaining the prior written consent of Lender, further pledge, assign or grant any security interest in any Reserve Fund or the monies deposited therein or permit any lien or encumbrance to attach thereto, or any levy to be made thereon, or any UCC-1 Financing Statements, except those naming Lender as the secured party, to be filed with respect thereto.

**7.4.6**    Borrower shall bear all reasonable costs associated with the investment of the sums in the account.    Such costs shall be deducted from the income or earnings on such investment, if any, and to the extent such income or earnings shall not be sufficient to pay such costs, such costs shall be paid by Borrower promptly on demand by Lender.    Lender shall have no liability for the rate of return earned or losses incurred on the investment of the sums in the account.

**7.4.7**    Lender shall not be liable for any loss sustained on the investment of any funds constituting the Reserve Funds.

**7.4.8**    Borrower shall indemnify Lender and hold Lender harmless from and against any and all actions, suits, claims, demands, liabilities, losses, damages, obligations and costs and expenses (including litigation costs and reasonable attorneys fees and expenses) arising from or in any way connected with the Reserve Funds or the performance of the obligations for which the Reserve Funds were established; provided, however, Borrower shall not be responsible to indemnify Lender for any actions, suits, claims, demands, liabilities, losses, damages, obligations and costs and expenses resulting from Lender's gross negligence or willful misconduct.    Borrower shall assign to Lender all rights and claims Borrower may have against

all Persons supplying labor, materials or other services which are to be paid from or secured by the Reserve Funds; provided, however, that Lender may not pursue any such right or claim unless an Event of Default has occurred and remains uncured.

7.4.9    If Mortgage Lender waives any reserves or escrow accounts required in accordance with the terms of the Mortgage Loan Agreement, which reserves or escrow accounts are also required in accordance with the terms of this Agreement, or if the Mortgage Loan is refinanced or paid off in full (without a prepayment of the Loan) and Reserve Funds that are required hereunder are not required under the new mortgage loan, then Borrower shall cause any amounts that would have been deposited into any reserves or escrow accounts in accordance with the terms of the Mortgage Loan Agreement to be transferred to and deposited with Lender in accordance with the terms of this Agreement and, if any letters of credit have been substituted by Mortgage Borrower for any such reserves or escrows as may be specifically permitted by the Mortgage Loan Agreement, then Borrower shall also cause such letters of credit to be transferred to Lender to be held by Lender upon the same terms and provisions as set forth in the Mortgage Loan Agreement.

## VIII.   DEFAULTS

### Section 8.1    Event of Default.

(a)    Each of the following events shall constitute an event of default hereunder (an "**Event of Default**"):

(i)    if any portion of the Debt or any payment of Reserve Funds due under this Agreement or the payment of the Debt due on the Maturity Date is not paid when due;

(ii)    if any of the Taxes or Other Charges are not paid when the same are due and payable;

(iii)    if the Policies are not kept in full force and effect, or if certified copies of the Policies are not delivered to Lender with ten (10) days after request by Lender;

(iv)    if Borrower Transfers or otherwise encumbers any portion of the Property or the Collateral without Lender's prior written consent in violation of the provisions of this Agreement, the Pledge Agreement or any other Loan Document;

(v)    if any representation or warranty made by Borrower herein or in any other Loan Document, or in any report, certificate, financial statement or other instrument, agreement or document furnished to Lender shall have been false or misleading in any material respect as of the date the representation or warranty was made;

(vi)    if Borrower, Mortgage Borrower, the Principal or any Guarantor shall make an assignment for the benefit of creditors;

(vii)    if a receiver, liquidator or trustee shall be appointed for Borrower, Mortgage Borrower, the Principal, Guarantor, or if Borrower, Mortgage Borrower, Principal or Guarantor shall be adjudicated a bankrupt or insolvent, or if any petition for bankruptcy, reorganization or arrangement pursuant to federal bankruptcy law, or any similar federal or state law, shall be filed by or against, consented to, or acquiesced in by, Borrower, Principal or Guarantor, or if any proceeding for the dissolution or liquidation of Borrower, Mortgage Borrower or Principal shall be instituted; provided, however, that if such appointment, adjudication, petition or proceeding was involuntary and not consented to by Borrower, Mortgage Borrower, Principal or Guarantor, then the same shall constitute an Event of Default only upon the same not being discharged, stayed or dismissed within sixty (60) days;

(viii)    if Borrower attempts to assign its rights under this Agreement or any of the other Loan Documents or any interest herein or therein in contravention of the Loan Documents;

(ix)    if Borrower breaches any of its respective negative covenants contained in Section 5.2. or any covenant contained in Section 4.1.30 or Section 5.1.11 hereof;

(x)    with respect to any term, covenant or provision set forth herein which specifically contains a notice requirement or grace period, if Borrower shall be in default under such term, covenant or condition after the giving of such notice or the expiration of such grace period;

(xi)    if a material default has occurred and continues beyond any applicable cure period under the Management Agreement (or any Replacement Management Agreement) if such default permits the Manager thereunder to terminate or cancel the Management Agreement (or any Replacement Management Agreement);

(xii)    if Borrower fails to comply with the covenants as to Prescribed Laws set forth in Section 5.1.1 hereof;

(xiii)    the failure of Borrower (or any members thereof) to meet the publication requirements established by the New York Limited Liability Company Law and the New York Partnership Law, each as currently enacted and as amended from time to time;

(xiv)    if Borrower shall continue to be in Default under any of the other terms, covenants or conditions of this Agreement not specified in subsections (i) to (xiii) above, for ten (10) days after notice to Borrower from Lender, in the case of any Default which can be cured by the payment of a sum of money, or for thirty (30) days after notice from Lender in the case of any other Default; provided, however, that if such non-monetary Default is susceptible of cure but cannot reasonably be cured within such 30-day period and provided further that Borrower shall have commenced to cure such Default within such 30-day period and thereafter diligently and expeditiously proceeds to cure the same, such 30-day period shall be extended for such time as is reasonably necessary for Borrower in the exercise of due diligence to cure such Default, such additional period not to exceed ninety (90) days;

(xv)    if there shall be default under any of the other Loan Documents beyond any applicable cure periods contained in such documents, whether as to Borrower or the Property or the Collateral, or if any other such event shall occur or condition shall exist, if the effect of such event or condition is to accelerate the maturity of any portion of the Debt or to permit Lender to accelerate the maturity of all or any portion of the Debt; and/or

(xvi)    if an Event of Default shall occur and be continuing pursuant to the Mortgage Loan Documents.

(b)    Upon the occurrence of an Event of Default (other than an Event of Default described in clauses (vi), (vii) or (viii) above) and at any time thereafter, in addition to any other rights or remedies available to it pursuant to this Agreement and the other Loan Documents or at law or in equity, Lender may take such action, without notice or demand, that Lender deems advisable to protect and enforce its rights against Borrower and in and to the Collateral, including, without limitation, declaring the Debt to be immediately due and payable, and Lender may enforce or avail itself of any or all rights or remedies provided in the Loan Documents and may exercise all the rights and remedies of a secured party under the Uniform Commercial Code, as adopted and enacted by the State where the Collateral is located against Borrower and the Collateral, including, without limitation, all rights or remedies available at law or in equity; and upon any Event of Default described in clauses (vi), (vii) or (viii) above, the Debt and all other obligations of Borrower hereunder and under the other Loan Documents shall immediately and automatically become due and payable, without notice or demand, and Borrower hereby expressly waives any such notice or demand, anything contained herein or in any other Loan Document to the contrary notwithstanding.

## Section 8.2    Remedies.

(a)    Upon the occurrence and during the continuance of an Event of Default, and except as expressly prohibited by the Intercreditor Agreement, all or any one or more of the rights, powers, privileges and other remedies available to Lender against Borrower under this Agreement or any of the other Loan Documents executed and delivered by, or applicable to, Borrower or at law or in equity may be exercised by Lender at any time and from time to time, whether or not all or any of the Debt shall be declared due and payable, and whether or not Lender shall have commenced any foreclosure proceeding or other action for the enforcement of its rights and remedies under any of the Loan Documents. Any such actions taken by Lender shall be cumulative and concurrent and may be pursued independently, singularly, successively, together or otherwise, at such time and in such order as Lender may determine in its sole discretion, to the fullest extent permitted by law, without impairing or otherwise affecting the other rights and remedies of Lender permitted by law, equity or contract or as set forth herein or in the other Loan Documents. Without limiting the generality of the foregoing, Borrower agrees that if an Event of Default is continuing beyond any applicable cure period (i) Lender is not subject to any "one action" or "election of remedies" law or rule, and (ii) all liens and other rights, remedies or privileges provided to Lender shall remain in full force and effect until Lender has exhausted all of its remedies against the Collateral and the Collateral has been foreclosed, sold and/or otherwise realized upon in satisfaction of the Debt or the Debt has been paid in full.

(b)    With respect to Borrower and the Collateral, nothing contained herein or in any other Loan Document shall be construed as requiring Lender to resort to any portion of the Collateral for the satisfaction of any of the Debt in any preference or priority to any other portion of the Collateral, and Lender may seek satisfaction out of all of the Collateral or any part thereof, in its absolute discretion in respect of the Debt.  In addition, Lender shall have the right from time to time to the extent permitted by applicable law to partially foreclose upon the Collateral in any manner and for any amounts secured by the Pledge Agreement then due and payable as determined by Lender in its sole discretion including, without limitation, the following circumstances:  (i) in the event Borrower defaults beyond any applicable grace period in the payment of one or more scheduled payments of principal and interest, Lender may foreclose upon the Collateral to recover such delinquent payments, or (ii) in the event Lender elects to accelerate less than the entire outstanding principal balance of the Loan, Lender may foreclose upon the Collateral to recover so much of the principal balance of the Loan as Lender may accelerate and such other sums secured by the Collateral as Lender may elect. Notwithstanding one or more partial foreclosures, the Collateral shall remain subject to the Pledge Agreement and the other Loan Documents payment of sums secured by the Pledge Agreement and the other Loan Documents and not previously recovered.

(c)    During the continuance of an Event of Default, Lender shall have the right from time to time to sever the Note and the other Loan Documents into one or more separate notes, mortgages and other security documents (the "**Severed Loan Documents**") in such denominations as Lender shall determine in its sole discretion for purposes of evidencing and enforcing its rights and remedies provided hereunder.  Borrower shall execute and deliver to Lender from time to time, promptly after the request of Lender, a severance agreement and such other documents as Lender shall request in order to effect the severance described in the preceding sentence, all in form and substance reasonably satisfactory to Lender.  Borrower hereby absolutely and irrevocably appoints Lender as its true and lawful attorney, coupled with an interest, in its name and stead to make and execute all documents necessary or desirable to effect the aforesaid severance, Borrower ratifying all that is said attorney shall do by virtue thereof.  Except if an Event of Default is continuing beyond any applicable cure periods, (i) Borrower shall not be obligated to pay any costs or expenses incurred in connection with the preparation, execution, recording or filing of the Severed Loan Documents, and (ii) the Severed Loan Documents shall not contain any representations, warranties or covenants not contained in the Loan Documents and any such representations and warranties contained in the Severed Loan Documents will be given by Borrower only as of the Closing Date.

(d)    Any amounts recovered from the Collateral after an Event of Default may be applied by Lender toward the payment of any interest and/or principal of the Loan and/or any other amounts due under the Loan Documents in such order, priority and proportions as Lender in its sole discretion shall determine.

(e)    Upon failure of Borrower to perform any of its obligations hereunder, Lender may, but without any obligation to do so and without notice to or demand on Borrower and without releasing Borrower from any obligation hereunder or being deemed to have cured any Event of Default hereunder, make, do or perform any obligation of Borrower hereunder in such manner and to such extent as Lender may deem necessary.  Borrower shall cause Mortgage

Borrower to permit Lender to enter upon the Property for such purposes (subject to the rights of tenants and other occupants of the Property), or appear in, defend, or bring any action or proceeding to protect its interest in the Property for such purposes, and the cost and expense thereof (including reasonable attorneys' fees to the extent permitted by law), with interest as provided in this Section 8.2, shall constitute a portion of the Debt and shall be due and payable to Lender upon demand. All such costs and expenses incurred by Lender in remedying such Event of Default or such failed payment or act or in appearing in, defending, or bringing any action or proceeding shall bear interest at the Default Rate, for the period after such cost or expense was incurred until the date of payment to Lender. All such costs and expenses incurred by Lender together with interest thereon calculated at the Default Rate shall be deemed to constitute a portion of the Debt and be secured by the liens, claims and security interests provided to Lender under the Loan Documents and shall be immediately due and payable upon demand by Lender therefor.

(f)     For the purpose of carrying out the provisions and exercising the rights, powers and privileges granted in this Section 8.2, Borrower hereby irrevocably constitutes and appoints the Lender its true and lawful attorney in fact to execute, acknowledge and deliver any instruments and do and perform any acts such as are referred to in this subsection in the name and on behalf of Borrower. This power of attorney is a power coupled with an interest and cannot be revoked.

(g)     The rights, powers and remedies of Lender under this Agreement shall be cumulative and not exclusive of any other right, power or remedy which Lender may have against Borrower pursuant to this Agreement or the other Loan Documents, or existing at law or in equity or otherwise. Lender's rights, powers and remedies may be pursued singularly, concurrently or otherwise, at such time and in such order as Lender may determine in Lender's sole discretion. No delay or omission to exercise any remedy, right or power accruing upon an Event of Default shall impair any such remedy, right or power or shall be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient. A waiver of one Default or Event of Default with respect to Borrower shall not be construed to be a waiver of any subsequent Default or Event of Default by Borrower or to impair any remedy, right or power consequent thereon.

## IX.    SPECIAL PROVISIONS

**Section 9.1    Sale of Note**. Borrower acknowledges and agrees that Lender may sell all or any portion of the Loan and the Loan Documents, or issue one or more participations therein. At the request of Lender, and to the extent not already required to be provided by Borrower under this Agreement, Borrower shall use reasonable efforts to provide information not in the possession of Lender or which may be reasonably required by Lender in order to sell all or any portion of the Loan and the Loan Documents, or issue one or more participations therein. **Intentionally Omitted**.

**Section 9.3    Intentionally Omitted**.

**Section 9.4    Intentionally Omitted**.

**Section 9.5    Matters Concerning Manager**.  If (i) an Event of Default has occurred and is continuing beyond any applicable cure period under any Loan Document, (ii) the Manager shall be in default (beyond any applicable grace or cure period) under the Management Agreement, or (iii) the Manager shall become bankrupt or insolvent or a debtor in any bankruptcy or insolvency proceeding, Borrower shall, at the request of Lender, cause Mortgage Borrower to terminate the Management Agreement and replace the Manager with a manager approved by Lender on terms and conditions satisfactory to Lender, it being understood and agreed that the management fee for such replacement manager shall not be in excess of the Management Fee Cap.

**Section 9.6    Servicer**.  At the option of Lender, the Loan may be serviced by a servicer or trustee (the "**Servicer**") selected by Lender and Lender may delegate all or any portion of its responsibilities under this Agreement and the other Loan Documents to the Servicer pursuant to a servicing agreement (the "**Servicing Agreement**") between Lender and the Servicer.  Borrower shall not be responsible for any set-up fees or any other initial costs relating to or arising under the Servicing Agreement, nor  shall Borrower be responsible for payment of the monthly servicing fee due to the Servicer under the Servicing Agreement.

## X.    MISCELLANEOUS

**Section 10.1    Survival**.  This Agreement and all covenants, agreements, representations and warranties made herein and in the certificates delivered pursuant hereto shall survive the making by Lender of the Loan and the execution and delivery to Lender of the Note, and shall continue in full force and effect so long as all or any of the Debt is outstanding and unpaid unless a longer period is expressly set forth herein or in the other Loan Documents. Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the legal representatives, successors and assigns of such party.  All covenants, promises and agreements in this Agreement, by or on behalf of Borrower, shall inure to the benefit of the legal representatives, successors and assigns of Lender.

**Section 10.2    Lender's Discretion**.    Whenever pursuant to this Agreement, Lender exercises any right given to it to approve or disapprove, or any arrangement or term is to be satisfactory to Lender, the decision of Lender to approve or disapprove or to decide whether arrangements or terms are satisfactory or not satisfactory shall (except as is otherwise specifically herein provided) be in the sole discretion of Lender and shall be final and conclusive. Whenever this Agreement expressly provides that Lender may not withhold its consent or its approval of an arrangement or term, such provisions shall also be deemed to prohibit Lender from delaying or conditioning such consent or approval.

**Section 10.3    Governing Law**.

(A)    **THIS AGREEMENT WAS NEGOTIATED IN THE STATE OF NEW YORK, THE LOAN WAS MADE BY LENDER AND ACCEPTED BY BORROWER IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE LOAN DELIVERED PURSUANT HERETO WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION**

EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS AND THE OBLIGATIONS ARISING HEREUNDER AND THEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA, EXCEPT THAT AT ALL TIMES THE PROVISIONS FOR THE CREATION, PERFECTION, AND ENFORCEMENT OF THE LIENS AND SECURITY INTERESTS CREATED PURSUANT HERETO AND PURSUANT TO THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED ACCORDING TO THE LAW OF THE STATE IN WHICH THE PROPERTY IS LOCATED, IT BEING UNDERSTOOD THAT, TO THE FULLEST EXTENT PERMITTED BY THE LAW OF SUCH STATE, THE LAW OF THE STATE OF NEW YORK SHALL GOVERN THE CONSTRUCTION, VALIDITY AND ENFORCEABILITY OF ALL LOAN DOCUMENTS AND ALL OF THE OBLIGATIONS ARISING HEREUNDER OR THEREUNDER. TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS, AND THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK PURSUANT TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

(B)    ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER OR BORROWER ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS MAY AT LENDER'S OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF NEW YORK, COUNTY OF NEW YORK, PURSUANT TO SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW AND BORROWER WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND BORROWER HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING. BORROWER DOES HEREBY DESIGNATE AND APPOINT:

> LAW OFFICES OF ARTHUR J. ISRAEL
> 260 MADISON AVENUE, 17TH FLOOR
> NEW YORK, NEW YORK 10016
> PHONE:  (212) 355-5353
> FAX:  (212) 448-0066
> ATTENTION:  CHARLES D. GOLIN, ESQ.

AS ITS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH

SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN NEW YORK, NEW YORK, AND AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS AND NOTICE OF SAID SERVICE MAILED OR DELIVERED TO BORROWER IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON BORROWER IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF NEW YORK. BORROWER (I) SHALL GIVE PROMPT NOTICE TO LENDER OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (II) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN NEW YORK, NEW YORK (WHICH SUBSTITUTE AGENT AND OFFICE SHALL BE DESIGNATED AS THE PERSON AND ADDRESS FOR SERVICE OF PROCESS), AND (III) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN NEW YORK, NEW YORK OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR. THIS PROVISION SHALL SURVIVE THE TERMINATION OF THIS AGREEMENT.

**Section 10.4    Modification, Waiver in Writing.**  No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement, or of the Note, or of any other Loan Document, nor consent to any departure by Borrower therefrom, shall in any event be effective unless the same shall be in a writing signed by the party against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given.  Except as otherwise expressly provided herein, no notice to, or demand on Borrower, shall entitle Borrower to any other or future notice or demand in the same, similar or other circumstances.

**Section 10.5    Delay Not a Waiver.**  Neither any failure nor any delay on the part of Lender in insisting upon strict performance of any term, condition, covenant or agreement, or exercising any right, power, remedy or privilege hereunder, or under the Note or under any other Loan Document, or any other instrument given as security therefor, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege.  In particular, and not by way of limitation, by accepting payment after the due date of any amount payable under this Agreement, the Note or any other Loan Document, Lender shall not be deemed to have waived any right either to require prompt payment when due of all other amounts due under this Agreement, the Note or the other Loan Documents, or to declare a default for failure to effect prompt payment of any such other amount.

**Section 10.6    Notices.**  All notices, consents, approvals and requests required or permitted hereunder or under any other Loan Document shall be given in writing and shall be effective for all purposes if hand delivered or sent by (a) certified or registered United States mail, postage prepaid, return receipt requested, (b) a nationally recognized overnight-courier service marked for early next day delivery, including, without limitation, Federal Express or (c) expedited prepaid delivery service, either commercial or United States Postal Service, with proof of attempted delivery, and by telecopier (with answer back acknowledged), addressed as follows (or at such other address and Person as shall be designated from time to time by any

party hereto, as the case may be, in a written notice to the other parties hereto in the manner provided for in this Section):

| | |
|---|---|
| If to Lender: | Estate of Lawrence Meinwald |
| | c/o Gerald B. Gasman, P.C. |
| | 10 Park Avenue, Suite 2A |
| | New York, New York 10016 |
| | Attention: Gerald B. Gasman, Esq. |
| | Facsimile No. (212) 563-2765 |
| with a copy to: | Schulte Roth & Zabel LLP |
| | 919 Third Avenue |
| | New York, New York 10022 |
| | Attention: Julian M. Wise, Esq. |
| | Facsimile No. (212) 593-5955 |
| If to Borrower: | Madison Hotel Owners LLC |
| | c/o Livorno Properties LLC |
| | 150 East 52nd Street, 10th Floor |
| | Attention: Joseph Ben Moha and Benzion Suky |
| | Facsimile No.: (212) 355-0114 |
| with a copy to: | Law Offices of Arthur J. Israel |
| | 260 Madison Avenue, 17th Floor |
| | New York, New York 10016 |
| | Attention: Charles D. Golin, Esq. |
| | Facsimile No.: (212) 448-0066 |

A notice shall be deemed to have been given: in the case of hand delivery, at the time of delivery; in the case of a notice sent via a nationally recognized overnight courier service, upon the first attempted delivery by such courier or in the case of registered or certified mail, when delivered or the first attempted delivery on a Business Day; or in the case of expedited prepaid delivery, upon the first attempted delivery on a Business Day; or in the case of telecopy, upon sender's receipt of a machine-generated confirmation of successful transmission after advice by telephone to recipient that a telecopy notice is forthcoming followed by a copy sent by a nationally recognized overnight courier service with early next business day delivery specified.

**Section 10.7    Trial by Jury**.

> **BORROWER AND LENDER HEREBY AGREE NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND EACH WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER AND**

LENDER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE.  LENDER AND BORROWER ARE HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY BORROWER AND LENDER.

Section 10.8  **Headings**.  The Article and/or Section headings and the Table of Contents in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

Section 10.9  **Severability**.    Wherever  possible,  each  provision  of  this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

Section 10.10  **Preferences**.  Lender shall have the continuing and exclusive right to apply or reverse and reapply any and all payments by Borrower to any portion of the obligations of Borrower hereunder.  To the extent Borrower makes a payment or payments to Lender, which payment or payments or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of such payment or payments received, the obligations hereunder or part thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment or payments had not been received by Lender.

Section 10.11  **Waiver of Notice**.  Borrower shall not be entitled to any notices of any nature whatsoever from Lender except with respect to matters for which this Agreement or the other Loan Documents specifically and expressly provide for the giving of notice by Lender to Borrower and except with respect to matters for which Borrower is not, pursuant to applicable Legal Requirements, permitted to waive the giving of notice.  Borrower hereby expressly waives the right to receive any notice from Lender with respect to any matter for which this Agreement or the other Loan Documents do not specifically and expressly provide for the giving of notice by Lender to Borrower.

Section 10.12  **Remedies of Borrower**.  In the event that a claim or adjudication is made that Lender or its agents have acted unreasonably or unreasonably delayed or conditioned acting in any case where by law or under this Agreement or the other Loan Documents, Lender or such agent, as the case may be, has an obligation to act reasonably or promptly, Borrower agrees that neither Lender nor its agents shall be liable for any monetary damages, and Borrower's sole remedies shall be limited to commencing an action seeking injunctive relief or declaratory judgment.  The parties hereto agree that any action or proceeding to determine whether Lender has acted reasonably shall be determined by an action seeking declaratory judgment.

**Section 10.13 <u>Expenses; Indemnity</u>**.

(a)        Borrower covenants and agrees to pay or, if Borrower fails to pay, to reimburse, Lender upon receipt of written notice from Lender for all reasonable costs and expenses (including, without limitation, reasonable attorneys' fees and disbursements) incurred by Lender in connection with (i) the preparation, negotiation, execution and delivery of this Agreement and the other Loan Documents and the consummation of the transactions contemplated hereby and thereby and all the costs of furnishing all opinions by counsel for Borrower (including, without limitation, any opinions requested by Lender as to any legal matters arising under this Agreement or the other Loan Documents); (ii) the negotiation, preparation, execution, delivery and administration of any consents, amendments, waivers or other modifications to this Agreement and the other Loan Documents and any other documents or matters requested by Lender; (iii) securing Borrower's compliance with any requests made pursuant to the provisions of this Agreement; (iv) the filing and recording fees and expenses, title insurance and reasonable fees and expenses of counsel for providing to Lender all required legal opinions, and other similar expenses incurred in creating and perfecting the Liens in favor of Lender pursuant to this Agreement and the other Loan Documents; (v) enforcing or preserving any rights, in response to third party claims or the prosecuting or defending of any action or proceeding or other litigation, in each case against, under or affecting Borrower, this Agreement, the other Loan Documents, the Property, or any other security given for the Loan; and (vi) enforcing any obligations of or collecting any payments due from Borrower under this Agreement, the other Loan Documents or with respect to the Property or in connection with any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a "work-out" or of any insolvency or bankruptcy proceedings; <u>provided</u>, <u>however</u>, that Borrower shall not be liable for the payment of any such costs and expenses to the extent the same arise by reason of the gross negligence, illegal acts, fraud or willful misconduct of Lender.

(b)        Borrower shall indemnify, defend and hold harmless Lender from and against any and all other liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, demands, costs, expenses and disbursements of any kind or nature whatsoever (including, without limitation, the reasonable fees and disbursements of counsel for Lender in connection with any investigative, administrative or judicial proceeding commenced or threatened, whether or not Lender shall be designated a party thereto), that may be imposed on, incurred by, or asserted against Lender in any manner relating to or arising from (i) any breach by Borrower of its obligations under, or any material misrepresentation by Borrower contained in, this Agreement or the other Loan Documents, or (ii) the use or intended use of the proceeds of the Loan (collectively, the "**Indemnified Liabilities**"); <u>provided</u>, <u>however</u>, that Borrower shall not have any obligation to Lender hereunder to the extent that such Indemnified Liabilities arise from the gross negligence, illegal acts, fraud or willful misconduct of Lender.  To the extent that the undertaking to indemnify, defend and hold harmless set forth in the preceding sentence may be unenforceable because it violates any law or public policy, Borrower shall pay the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by Lender.

**Section 10.14 <u>Schedules Incorporated</u>**.    The Schedules annexed hereto are hereby incorporated herein as a part of this Agreement with the same effect as if set forth in the body hereof.

**Section 10.15 <u>Offsets, Counterclaims and Defenses</u>**.  Any assignee of Lender's interest in and to this Agreement, the Note and the other Loan Documents shall take the same free and clear of all offsets, counterclaims or defenses which are unrelated to such documents which Borrower may otherwise have against any assignor of such documents, and no such unrelated counterclaim or defense shall be interposed or asserted by Borrower in any action or proceeding brought by any such assignee upon such documents and any such right to interpose or assert any such unrelated offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by Borrower.

**Section 10.16 <u>No Joint Venture or Partnership; No Third Party Beneficiaries</u>**.

(a)    Borrower and Lender intend that the relationships created hereunder and under the other Loan Documents be solely that of borrower and lender.  Nothing herein or therein is intended to create a joint venture, partnership, tenancy-in-common, or joint tenancy relationship between Borrower and Lender nor to grant Lender any interest in the Property other than that of mortgagee, beneficiary or lender.

(b)    This Agreement and the other Loan Documents are solely for the benefit of Lender and Borrower and nothing contained in this Agreement or the other Loan Documents shall be deemed to confer upon anyone other than Lender and Borrower any right to insist upon or to enforce the performance or observance of any of the obligations contained herein or therein.  All conditions to the obligations of Lender to make the Loan hereunder are imposed solely and exclusively for the benefit of Lender and no other Person shall have standing to require satisfaction of such conditions in accordance with their terms or be entitled to assume that Lender will refuse to make the Loan in the absence of strict compliance with any or all thereof and no other Person shall under any circumstances be deemed to be a beneficiary of such conditions, any or all of which may be freely waived in whole or in part by Lender if, in Lender's sole discretion, Lender deems it advisable or desirable to do so.

**Section 10.17 <u>Subordinate Nature of Agreement</u>**.  Notwithstanding anything contained in this Agreement to the contrary, this Agreement and all of the other Loan Documents are subject and subordinate in all respects to the Mortgage Loan Documents.  Lender's rights and remedies contained herein are subject to the terms and provisions of the Intercreditor Agreement.

**Section 10.18 <u>Waiver of Marshalling of Assets</u>**.  To the fullest extent permitted by law, Borrower, for itself and its successors and assigns, waives all rights to a marshalling of the assets of Borrower, Borrower's members and others with interests in Borrower, and of the Property, or to a sale in inverse order of alienation in the event of foreclosure of the Mortgage, and agrees not to assert any right under any laws pertaining to the marshalling of assets, the sale in inverse order of alienation, homestead exemption, the administration of estates of decedents, or any other matters whatsoever to defeat, reduce or affect the right of Lender under the Loan Documents to a sale of the Property for the collection of the Debt without any prior or different resort for collection or of the right of Lender to the payment of the Debt out of the net proceeds of the Property in preference to every other claimant whatsoever.

Section 10.19 **Waiver of Counterclaim**. Borrower hereby waives the right to assert a counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against it by Lender or its agents.

Section 10.20 **Conflict; Construction of Documents; Reliance**. In the event of any conflict between the provisions of this Agreement and any of the other Loan Documents, the provisions of this Agreement shall control. The parties hereto acknowledge that they were represented by competent counsel in connection with the negotiation, drafting and execution of the Loan Documents and that such Loan Documents shall not be subject to the principle of construing their meaning against the party which drafted same. Borrower acknowledges that, with respect to the Loan, Borrower shall rely solely on its own judgment and advisors in entering into the Loan without relying in any manner on any statements, representations or recommendations of Lender or any parent, subsidiary or Affiliate of Lender. Lender shall not be subject to any limitation whatsoever in the exercise of any rights or remedies available to it under any of the Loan Documents or any other agreements or instruments which govern the Loan by virtue of the ownership by it or any parent, subsidiary or Affiliate of Lender of any equity interest any of them may acquire in Borrower, and Borrower hereby irrevocably waives the right to raise any defense or take any action on the basis of the foregoing with respect to Lender's exercise of any such rights or remedies. Borrower acknowledges that Lender engages in the business of real estate financings and other real estate transactions and investments which may be viewed as adverse to or competitive with the business of Borrower or its Affiliates.

Section 10.21 **Brokers and Financial Advisors**. Borrower hereby represents that it has dealt with no financial advisors, brokers, underwriters, placement agents, agents or finders in connection with the transactions contemplated by this Agreement. Borrower hereby agrees to indemnify, defend and hold Lender harmless from and against any and all claims, liabilities, costs and expenses of any kind (including Lender's attorneys' fees and expenses) in any way relating to or arising from a claim by any Person that such Person acted on behalf of Borrower or Lender in connection with the transactions contemplated herein. The provisions of this Section 10.21 shall survive the expiration and termination of this Agreement and the payment of the Debt.

Section 10.22 **Prior Agreements**. This Agreement and the other Loan Documents contain the entire agreement of the parties hereto and thereto in respect of the transactions contemplated hereby and thereby, and all prior agreements among or between such parties, whether oral or written, are superseded by the terms of this Agreement and the other Loan Documents.

**[No Further Text on this Page; Signature Page Follows]**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

BORROWER:

**MADISON HOTEL OWNERS LLC,**
a New York limited liability company

By:   62 Madison Partners LLC,
      its Managing Member

      By: _____
          Name:  Joseph Ben Moha
          Title:  Managing Member

      By: _____
          Name:  Benzion Suky
          Title:  Managing Member


LENDER:

**ESTATE OF LAWRENCE MEINWALD**

By: _____
    Name:  Lawrence Arnsten
    Title:  Executor

## SCHEDULE I

## (Organizational Structure)

Madison Hotel Project
62 Madison Avenue, N.Y., N.Y.

Organizational Chart – July 6, 2008

